**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

FEDERAL TRADE COMMISSION,

       Plaintiff,

                                 Case No. 3:14-cv-786-J-34PDB

vs.

LANIER LAW, LLC, et al.,

       Defendants.

_____/

# O R D E R

**THIS CAUSE** is brought by the Federal Trade Commission (FTC), pursuant to its authority under section 5 of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45, against Defendants Lanier Law LLC, Fortress Law Group LLC, Surety Law Group LLP (Surety), Liberty & Trust Law Group of Florida LLC (Liberty & Trust), Fortress Law Group, PC (Fortress DC), Redstone Law Group, LLC (Redstone DC), Michael W. Lanier, Rogelio Robles and Edward William Rennick III (Defendants).[1]  The FTC alleges that Defendants violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the Mortgage Assistance Relief Services Rule (MARS Rule), 16 C.F.R. Part 322, recodified as Mortgage Assistance Relief Services (Regulation O), 12 C.F.R. Part 1015 (Regulation O), and the Telemarketing Sales Rule (TSR), 16 C.F.R. Part 310, in connection with the marketing and sale of mortgage assistance relief services.  See generally Plaintiff Federal Trade Commission's Amended Complaint for Permanent Injunction and Other Equitable Relief (Doc. 91; Amended

---

[1]     Defendants Surety, Redstone DC, and Rennick reached a settlement with the FTC.  Those parties filed a Joint Motion of Plaintiff and Defendants Edward Rennick III, Surety Law Group LLP, and Redstone Law Group LLC to Approve and File the Stipulated Order for Permanent Injunction and Monetary Judgment (Doc. 230) on November 10, 2015, which the Court will address by separate order.

Complaint), filed December 22, 2014. At the outset of these proceedings, on the FTC's motion, the Court entered a temporary restraining order against Defendants Lanier Law LLC, Fortress Law Group LLC, Surety, Liberty & Trust, and Michael Lanier. See Ex Parte Temporary Restraining Order with an Asset Freeze and Other Equitable Relief (Doc. 10; TRO), entered July 11, 2014. Thereafter, the Court dissolved a portion of the TRO and granted, in part, the FTC's request for preliminary injunctive relief against those Defendants with respect to Counts I, III, and VII of the original Complaint (Doc. 4). See Preliminary Injunction Order with Asset Freeze and Other Equitable Relief (Doc. 59), entered August 1, 2014. The FTC amended the complaint to add additional Defendants and after appropriate briefing the Court expanded the preliminary injunction to those Defendants as well. See Preliminary Injunction Order with Asset Freeze and Other Equitable Relief (Doc. 115), entered February 6, 2015.

This matter is currently before the Court on Plaintiff Federal Trade Commission's Motion and Memorandum for Summary Judgment (Doc. 246; FTC Motion), filed on December 29, 2015, and Defendant Michael W. Lanier's Motion for Partial Summary Judgment (Doc. 248; Lanier Motion), filed on December 30, 2015.[2] On January 20, 2016, Defendants Fortress DC and Rogelio Robles (collectively, Fortress Defendants), as well as Defendant Michael W. Lanier filed responses in opposition to the FTC Motion. See Defendant, Fortress Law Group, PC and Rogelio Robles', Response to Plaintiffs Motion for Summary Judgment (Doc. 252; Fortress Response); Defendant Michael W. Lanier's

---

[2] The FTC subsequently filed notices correcting inadvertent errors in the exhibits to the FTC Motion. See Plaintiff's Notice of Filing to Plaintiff's Motion for Summary Judgment (Doc. 258), filed January 28, 2016; Plaintiff's Notice of Filing to Insert and Substitute Pages of Attachments Submitted in Support of Plaintiff's Motion for Summary Judgment (Doc. 260), filed February 1, 2016. On December 31, 2015, Lanier filed the exhibits to the Lanier Motion. See Defendant Michael W. Lanier's Notice of Filing (Doc. 250).

Affidavit in Opposition to Summary Judgment (Doc. 253; Lanier Response).[3]  On March 10, 2016, with leave of Court, see Order (Doc. 263), Lanier filed a supplement to the Lanier Response.  See Defendant Michael W. Lanier's Supplementary Affidavit in Opposition to the FTC Motion for Summary Judgment (Doc. 264; Lanier Supplement).  The Federal Trade Commission responded to the Lanier Supplement on March 29, 2016.  See Plaintiff's Reply to Lanier Defendants' Supplement to the Affidavit Opposing Plaintiff's Motion for Summary Judgment (Doc. 267; FTC Reply).  In addition, the FTC filed a response to the Lanier Motion on January 20, 2016.  See Plaintiff's Response in Opposition to Defendant Michael W. Lanier's Motion for Partial Summary Judgment (Doc. 255; FTC Response). The Court granted Lanier permission to file a reply to the FTC Response, see Order (Doc. 259), and he did so on February 2, 2016.  See Defendant Michael W. Lanier's Reply to Plaintiff's Opposition to Lanier's Motion for Partial Summary Judgment (Doc. 261; Lanier Reply).  Accordingly, this matter is ripe for review.

## I.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

---

[3]     Although not explicitly stated, it appears Lanier intended to respond on behalf of himself individually, as well as the entities he owns, specifically, Defendants Lanier Law, LLC d/b/a Redstone Law Group and as the Law Offices of Michael W. Lanier, Fortress Law Group, LLC, and Liberty & Trust Law Group of Florida, LLC (collectively, with Lanier, the Lanier Defendants).  Lanier filed the exhibits to his Response at Document 254.

materials."   Rule 56(c)(1)(A).[4]   An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must

---

[4]     Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged.  The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## II.   Evidentiary Challenges

In his Response, Lanier challenges the FTC's use of declarations as evidence in support of the FTC Motion.  According to Lanier, these declarations are inadmissible because the FTC has not moved to admit them under Federal Rule of Evidence (FRE) 807, and even if the FTC had done so, the declarations fail to satisfy the residual hearsay exception.  See Lanier Response at 2.  In support, Lanier relies on cases in which courts have considered the admissibility of declarations in lieu of testimony at trial, such as F.T.C. v. Washington Data Resources, No. 8:09-cv-2309-T-23TBM, 2011 WL 2669661, at *3-5 (M.D. Fla. July 7, 2011) and F.T.C. v. Direct Benefits Group, LLC, No. 6:11-cv-1186-Orl-28TBS, 2012 WL 5508050, at *1 (M.D. Fla. Nov. 14, 2012), as well as F.T.C. v. E.M.A. Nationwide, Inc., No. 1:12-CV-2394, 2013 WL 4545143, at *2-3 (N.D. Ohio Aug. 27, 2013), in which the court addressed whether consumer complaints to other agencies, as opposed to declarations made under penalty of perjury, were appropriate evidence at summary judgment.  See Lanier Response at 3-5.  However, Lanier's argument is specious and the authorities he cites in support are not relevant to the current posture of this case.  The issue before this Court is the use of declarations to support a motion for summary judgment, and thus Rule 56, not FRE 807, is the applicable authority.

As stated above, pursuant to Rule 56, a party may support a motion for summary judgment by citing to: "depositions, documents, electronically stored information, affidavits

or <u>declarations</u>, stipulations (including those made for purposes of the motion only) admissions, interrogatory answers, or other materials." <u>See</u> Rule 56(c)(1)(A) (emphasis added).   To rely on a declaration, the Rule requires that it: "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Rule 56(c)(4).  In the declarations submitted by the FTC, the declarants state that they are over 18 years of age, have personal knowledge of the facts stated, and would testify to those facts if called. <u>See</u>, <u>e.g.</u>, FTC Motion, Exs. 1A, 1B, 2-25, 300-338.   Moreover, each declaration is signed under penalty of perjury pursuant to 28 U.S.C. § 1746. <u>Id.</u> As such, to the extent the declarations contain testimony that would be admissible in Court if the declarant were called to testify, the Court may appropriately consider these declarations in resolving the instant Motions. <u>See</u> Rule 56(c)(1)(A), (c)(4); <u>McMillian v. Johnson</u>, 88 F.3d 1573, 1584 (11th Cir. 1996) (explaining that <u>otherwise admissible</u> evidence may be "submitted in <u>inadmissible form</u> at the summary judgment stage, though at trial it must be submitted in admissible form"). Significantly, Lanier fails to identify any declaration of record that does not comply with these requirements, nor does he raise any hearsay, personal knowledge, or other relevant challenge to any specific portion of a declarant's testimony.   Thus, the Court rejects Lanier's wholesale challenge to the FTC's use of declarations as evidence.[5]

---

[5]      Lanier also asserts that some of the consumers and "of-counsel" attorneys who submitted declarations were "disclosed after the discovery cutoff, others after filing of FTC's Motion for Summary Judgment." <u>See</u> Lanier Response at 4 n.1, 22; Lanier Reply at 4 n.1 & n.2.  It is unclear whether Lanier takes issue with the FTC's disclosure of the actual declarations after the discovery deadline, or whether Lanier contends that the FTC failed to identify these witnesses in discovery. <u>See</u> Lanier Response at 1, Ex. 2 (Doc. 250-2).  Regardless, Lanier has neither moved for relief on this basis, nor provided any evidence or details with regard to the FTC's purportedly insufficient disclosures, as such the Court will not consider whether exclusion is warranted under Rule 37(c)(1).

Lanier also challenges the credibility of the FTC investigators who filed declarations in support of the FTC Motion. See Lanier Response at 20-21. "Generally, judicial credibility determinations are not proper at the summary judgment stage of the proceedings." Young v. Rios, 390 F. App'x 982, 983 (11th Cir. 2010). However, upon review, Lanier's credibility challenge does little to undermine the testimony of the investigators and instead reflects Lanier's fundamental misunderstanding of the difference between a legal and a factual question. See Lanier Response at 20. Moreover, to the extent Lanier takes issue with the way the FTC divided the investigatory tasks among the investigators and the attorneys, he fails to explain how this is relevant to the matter of credibility. Notably, the testimony of the FTC investigators is largely supported by extensive documentary evidence, the authenticity of which Lanier does not challenge. Thus, in the absence of any specific argument regarding a particular aspect of an investigator's testimony, the Court finds that Lanier's general credibility attack is insufficient under the circumstances to create an issue of fact. See Curl v. Int'l Bus. Machs. Corp., 517 F.2d 212, 214 (5th Cir. 1975) ("[T]he opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." (internal quotation omitted)).[6]

---

[6]    In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

### III.     Background[7]

### A. The Participants

Defendant Michael W. Lanier is an attorney, licensed to practice law in the State of

Florida.  See Lanier Response at 6.  In approximately 2011, Lanier established Lanier Law,

LLC, which operated under various names, including "The Law Offices of Michael W.

Lanier," "Fortress Law Group," "Redstone Law Group," and "Vanguard Law Group"

---

[7]      Because this case is before the Court on cross-motions for summary judgment, the Court will, when addressing the merits of either party's motion, view the facts presented in the light most favorable to the party opposing summary judgment.  The Court will so note its perspective when appropriate.  The facts recited in this section are either undisputed, or any disagreement has been indicated.  See T-Mobile South LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

The Court notes that the Fortress Defendants do not submit any evidence with their Response.  See generally Fortress Response.  These Defendants previously submitted evidence during the preliminary injunction stage of the proceedings.  See Defendants Surety Law Group, LLP, Redstone D.C., Fortress D.C., Robles and Rennick's Response to FTC's Renewed Motion for Preliminary Injunction (Doc. 103; D.C. Entities Prelim. Inj. Resp.); Notice of Filing (Doc. 112).  Because the Fortress Defendants do not cite to that evidence in their Response, the Court need not consider it.  See Rule 56(c).  Nonetheless, the Court discussed that evidence at length during the preliminary injunction hearing on February 19, 2015, see Minute Entry (Doc. 118), and incorporates herein by reference the transcript of that hearing, specifically with respect to the Court's summary of the undisputed evidence.  See Telephonic Continuation of Preliminary Injunction Hearing (Doc. 122; Feb. 19 Tr.) at 14-33.  Likewise, the Lanier Defendants also submitted evidence in response to the FTC's request for a preliminary injunction.  See Declarations (Docs. 24-26, 46).  The Court incorporates its discussion of that evidence during the August 1, 2014 preliminary injunction hearing.  See Continuation of Preliminary Injunction Hearing (Doc. 62; Aug. 1 Tr.) at 6-9, 16-17.

In addition, because Lanier responded to the FTC Motion in the form of an affidavit, his Response contains both legal argument and assertions of fact.  To the extent Lanier intends for his legal arguments to constitute evidence in opposition to the FTC Motion, he is mistaken.  See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991) ("A nonmoving party, opposing a motion for summary judgment supported by affidavits cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions . . . .  The evidence presented cannot consist of conclusory allegations or legal conclusions." (internal citation omitted)).  Likewise, the general denials and conclusory factual assertions included in the Lanier Response, although sworn, are nonetheless insufficient on summary judgment to create an issue of fact in the face of specific evidence to the contrary.  See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000) ("[O]ne who resists summary judgment must meet the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial." (emphasis added) (internal quotation omitted)); Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value."); Broadway v. City of Montgomery, Ala., 530 F.2d 657, 660 (5th Cir. 1976) ("The affidavit constitutes nothing more than a recital of unsupported allegations, conclusory in nature.  As such it is insufficient to avoid summary judgment." (internal footnote omitted)); see also Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp. 2d 1297, 1304 (M.D. Fla. 2011) ("'[U]nsubstantiated, conclusory allegations are insufficient to survive summary judgment' when contradicted by the record." (quoting Kloha v. Duda, 246 F. Supp. 2d 1237, 1242 (M.D. Fla. 2003))).

(collectively, Lanier Law).[8]  See FTC Motion, Ex. 200: Deposition of Michael W. Lanier (Doc. 269; Lanier Dep.) at 14-15.[9]  Under these various names, Lanier offered mortgage assistance relief services, such as foreclosure defense and loan modifications, to consumers nationwide who were in danger of losing their homes.  See Declaration of Michael W. Lanier (Doc. 25; Lanier Decl.) ¶ 5.[10]  Lanier contracted with a company called Pinnacle Legal Services (Pinnacle), owned by Defendant Rogelio Robles, Defendant Edward W. Rennick III, and Willem Young, to provide legal staffing for Lanier Law.[11]  See Lanier Dep. at 20; see also FTC Motion, Ex. 201: Deposition of Rogelio Robles (Doc. 270; Robles Dep.) at 55-56.[12]  Pinnacle also provided legal staffing for Lanier's operations as Redstone and Vanguard.  See Lanier Dep. at 67.  Another company, Fortress Legal Services, owned by Robles, provided legal staffing for the work Lanier did as Fortress Law

---

[8]      Lanier Law operated from various locations throughout Jacksonville including: 4237 Salisbury Road, Building 1, 7960 Baymeadows Way, Suite 100, and 4720 Salisbury Road.  See Declaration of Michael W. Lanier (Doc. 25; Lanier Decl.) ¶ 6.  Lanier Law d/b/a Fortress and Redstone operated from the 4720 Salisbury Road address.  Id. ¶¶ 16, 19.  Lanier Law d/b/a Vanguard Law Group operated from that address as well.  See FTC Motion, Ex. 28, Att. FF.

[9]      Lanier formed a Florida limited liability company called Fortress Law Group, LLC on July 28, 2011.  See Lanier Decl. ¶ 7.  However, Lanier dissolved this entity in April 2012, and opted to use Lanier Law d/b/a Fortress Law Group instead.  See Lanier Decl. ¶ 8; Lanier Dep. at 68.

[10]     Lanier emphasizes that he did not operate "a loan modification business," but rather ran a "law firm that represented clients facing foreclosure," and "[a]ncillary to that representation, a loan modification or other form of settlement between the parties may have been sought."  See Lanier Response at 5.

[11]     Pinnacle is associated with an address at 6821 Southpoint Drive North, # 125, Jacksonville, Florida.  See FTC Motion, Ex. 333, Att. B.  In addition, a client agreement executed in 2011 identifies Pinnacle's address as 7960 Baymeadows Way, Suite 104, Jacksonville, Florida.  See id., Ex. 28, Att. II.

[12]     Willem Young is also known as Alvin Young.  See FTC Motion, Ex. 202: Deposition of Edward Rennick (Doc. 271; Rennick Dep.) at 14.  Rennick, Robles and Young are not attorneys.  See id., Ex. 203: Deposition of John J. Kane, Jr. (Doc. 272; Kane Dep.) at 42-43.  In mid to late 2009, Rennick and Young were partners in an entity called Rennick, Young & Cohen (RYC) which provided loan modification and foreclosure defense services to consumers.  See Rennick Dep. at 14-15.  Cohen was not a real person, and was used to add "credibility to the name."  Id. at 14.  After the FTC issued the MARS Rules, Rennick felt RYC would not be compliant with the new Rules and began "processing for attorneys" instead, in light of an exemption in the Rules for attorneys.  See Rennick Dep. at 14-15.

Group.  See id. at 67-68; see also Robles Dep. at 92.  As such, according to Lanier, he was the only employee of Lanier Law, see Lanier Dep. at 164, and the individuals working in his office, answering the phone, and managing his case files were employees of the staffing companies, id. at 63-65.  Lanier Law paid Pinnacle and Fortress Legal Services for the hours these employees worked at the firm.  Id. at 68.

Robles owned another business called the Department of Loss Mitigation and Forensics (DOLMF), located at 4327 Salisbury Road, which at one point also provided legal staffing, "employee-leasing," and processing services to Lanier.[13]  See Robles Dep. at 19, 27, 43, 112.  Although employed by DOLMF, because DOLMF serviced Lanier Law, Robles represented himself to consumers as the Operations Manager for the Law Offices of Michael W. Lanier.[14]  Id. at 57-58.  Robles hired, trained and supervised DOLMF's employees, was kept apprised of any issues that arose with consumers, and spoke to consumers with complaints.  Id. at 41-42, 44-45, 123, 128-29.  DOLMF also provided staffing to a company called First United Relief Foundation (FURF), owned by Anthony Gresham, an employee or former employee of DOLMF.  See id. at 45, 68.  Robles was "in charge" of FURF as well, and the company largely functioned as another name for DOLMF.  Id. at 42-43, 68-71 ("I guess [FURF] was just a different name that the staff that was employed by [DOLMF] picked up the phone as.").  Significantly, DOLMF paid Avanti Media Solutions, a company located at 6821 Southpoint Drive North, Suite 125, Jacksonville,

_____

[13]   According to Lanier, he became uncomfortable with DOLMF employees working for his law firm, because DOLMF was also engaged in marketing.  See Lanier Dep. at 57-58.  To alleviate this concern, Robles set up Fortress Legal Services to provide the staffing services, and some employees of DOLMF became employees of Fortress Legal Services instead.  See Lanier Dep. at 60-61.

[14]   After Robles, Pam Thomas was the office manager for Lanier Law d/b/a Fortress Law Group.  See Lanier Dep. at 123, 143-44.  Alexis Wrenn worked as the office manager of the Law Offices of Michael W. Lanier, then Lanier Law, and then Lanier Law d/b/a Redstone.  See Lanier Dep. at 123.

Florida, and owned by Young, to print and mail flyers, including a flyer titled Economic Stimulus Mortgage Notification.  See Robles Dep. at 36, 38-39, 108-111, Ex. 97 (Doc. 246-1 at 66; the Economic Stimulus Flyer).  This Flyer, discussed further below, solicited consumers to contact DOLMF for mortgage relief services.

In December of 2011, the Florida Bar began investigating Lanier's law practice.  See Lanier Decl. ¶ 10.  On November 5, 2012, the Florida Bar served Lanier, through his attorney, with a Complaint alleging violations of the Rules Regulating the Florida Bar (Florida Bar Rules) with respect to Lanier's foreclosure defense services.  See FTC Motion, Ex. 1A: Declaration of Michael Liggins (Liggins Decl.), Att. LL (the Bar Complaint).  Lanier entered a conditional guilty plea to the Bar Complaint, id., Att. MM (the Guilty Plea), and on July 24, 2013, the Supreme Court of Florida entered judgment against Lanier suspending him from the practice of law for forty-five days, commencing August 23, 2013, id., Att. NN.[15]  Following his suspension, on October 31, 2013, Lanier formed Liberty & Trust and resumed his foreclosure defense practice, this time limiting his clientele to Florida consumers.  See Lanier Decl. ¶¶ 29-30.[16]  Liberty & Trust also does business as Lighthouse Law Group.  See Lanier Dep. at 16.

In July, August, and September of 2012, Surety, Fortress DC, and Redstone DC, respectively, were formed in the District of Columbia (collectively, the DC Entities).  See

---

[15]     According to Lanier's Guilty Plea, both Pinnacle and DOLMF shared an address and phone number with Lanier's law office at one time.  See Guilty Plea at 2.  Based on the conduct of DOLMF, Robles, and Pinnacle, Lanier pled guilty to violating the Rules Regulating the Florida Bar concerning supervisory responsibility of non-lawyer assistants and solicitation.  See generally id.

[16]     Lyndi Spencer is the office manager for Liberty & Trust and previously worked as a case manager for Redstone DC.  See Lanier Dep. at 141.  Liberty & Trust's office is located at Southpoint II, 4110 Southpoint Blvd., Jacksonville, Florida.  See FTC Motion, Ex. 29 ¶ 5; Liggins Decl., Att. L.

Liggins Decl., Atts. M, N; FTC Motion, Ex. 28: Declaration of Roberto C. Menjivar (Menjivar Decl.), Att. L.  Pursuant to its equity and partnership agreement, Surety was a partnership of Pablo Santiago, Jr., Esq., an attorney licensed in the District of Columbia (D.C.), as well as Rennick, Robles, and Young.  See Menjivar Decl., Att. K.[17]  Robles and Tina Greene, a member of the D.C. Bar, entered into a partnership agreement forming Fortress DC.  See Liggins Decl., Att. N; Robles Dep., Ex. 115.  Redstone DC's members were Rennick, Lanier, Robles, Young, and John James Kane Jr.  See Menjivar Decl., Att. M.  However, Lanier held only a six percent interest in Redstone DC, id., which he later abandoned.  See Lanier Decl. at 6 n.2; Rennick Dep. at 29.[18]  Robles, Rennick, Lanier and Young decided to open the DC Entities after they "figured out that there was a way that a nonattorney could own a law firm out of DC . . . ."  See Robles Dep. at 32.[19]  Although these businesses were formed in D.C. and had D.C. addresses, their D.C. offices were merely "virtual offices" to which mail could be delivered, but was then forwarded to Jacksonville, Florida.  See

---

[17]     On January 16, 2013, the partners amended the partnership agreement to remove Pablo Santiago, and replace him with John James Kane, Jr., Esq.  See Menjivar Decl., Att. K.

[18]     In his Response, Lanier asserts that the FTC Motion indicates that he was only a partner in Redstone DC for nineteen days, and he thereafter adopts that as fact.  See Lanier Response at 8, 18-19.  The Court does not interpret the cited paragraphs of the FTC Motion in the same way.  See FTC Motion ¶¶ 51-53 (asserting that Lanier signed an operating agreement with Redstone DC on September 19, 2012, and that Lanier transferred Lanier Law's client files to the DC Entities on October 8, 2012).  As such, the Court rejects Lanier's mischaracterization of the evidence and relies on Lanier's previous Declaration in which he stated that he was a member of Redstone DC for no more than three months.  See Lanier Decl. at 6 n.2.

[19]     Lanier denies that he had any involvement in the formation of the DC Entities.  See Lanier Response at 10-11.  However, as set forth below, Lanier concedes that he transferred his foreclosure defense cases to Redstone DC and Fortress DC, Redstone DC used the same Pinnacle computer server to access the files of Lanier's former clients, the same Pinnacle employees who had worked for Lanier thereafter worked for Redstone DC and Surety DC, Lanier allowed the principals of the DC Entities to "take over" his merchant payment processing portals, and Lanier continued to manage the of-counsel attorney network on behalf of Surety and Redstone DC.  See Lanier Response at 10-12; Supplemental Declaration of Michael W. Lanier (Doc. 46; Lanier Supp. Decl.) ¶¶ 9-12.

Rennick Dep. at 33; Kane Dep. at 19-20; FTC Motion, Ex. 204: Deposition of Tina Greene (Doc. 273; Greene Dep.) at 56.[20]

In August and October of 2012, respectively, Lanier stopped accepting new clients for Lanier Law d/b/a Redstone, and Lanier Law d/b/a Fortress.  See Lanier Decl. ¶¶ 11, 12. Lanier maintains that in October of 2012, he transferred his law practice to the DC Entities. See Lanier Dep. at 68-69.  Specifically, on October 8, 2012, Lanier sold the "Foreclosure Defense; Loss Mitigation; Debt Management and Debt Defense Litigation," areas of his law practice to Redstone DC, and transferred "all of Lanier's existing cases, consenting clients, and fees from Lanier to Redstone."  See Menjivar Decl., Att. O.[21]  Lanier also transferred his foreclosure defense clients to Fortress DC.  See Lanier Response at 8.  At that time, Pinnacle stopped working for Lanier and transitioned to the DC Entities, see Lanier Dep. at 68-69; Rennick Dep. at 48-49, such that the Pinnacle employees who had previously serviced clients of Lanier Law continued their involvement with those clients on behalf of the respective DC Entity.  See Lanier Dep. at 24.  Likewise, the employees of DOLMF working on behalf of Lanier Law transitioned to working for Fortress DC.  See Robles Dep. at 43.  Lanier left in place his "Moneygram portal" and "Merchant Account portal," by which

---

[20]     Surety's D.C. address is listed on consumer agreements as 2101 L Street NW, Suite 800.  See FTC Motion, Ex. 335, Att. A.  Surety also had a Processing & Enrollment Center at 6821 Southpoint Drive, North, Suite 125.  See id., Att. B; see also Rennick Dep. at 62.  The virtual office for Fortress DC was 1629 K Street NW, Suite 300, Washington, DC 20006.  See FTC Motion, Ex. 323, Att. A.  Business records on file with the D.C. Department of Consumer and Regulatory Affairs associate Surety with this address as well.  See Liggins Decl. ¶ 11, Att. M.  Fortress DC had its Enrollment & Processing Center in Jacksonville, Florida at 4237 Salisbury Road, Suite 108.  See FTC Motion, Ex. 323, Att. A.  Redstone DC had a D.C. office at 1425 K Street NW, Suite 360, with a Jacksonville Enrollment & Processing Center at 6821 Southpoint Drive N, # 225.  See id., Ex. 324, Att. B.

[21]     The record contains an October 8, 2012 Purchase Agreement between Surety and Lanier Law, LLC for the purchase of Lanier's foreclosure defense and loss mitigation practice areas as well.  See Menjivar Decl., Att. P.  However, this agreement is unexecuted and Lanier denies that any foreclosure defense clients were transferred to Surety.  See Lanier Response at 8; Lanier Dep. at 42.

consumers could submit payments, and allowed the DC Entities to "take over" those accounts to "accommodate[]" the "reasonable requests" of his "friends," the principals of those Entities. <u>See</u> Lanier Response at 12; Supplemental Declaration of Michael W. Lanier (Doc. 46; Lanier Supp. Decl.) ¶ 10. In addition, according to Lanier, he continued to recruit and maintain the of-counsel network for Redstone DC, as well as Surety. <u>See</u> Lanier Response at 19-20; Lanier Dep. at 121-22.[22] In doing so, Lanier would call and speak with the lawyers, hire them on behalf of Redstone DC, and on occasion, fire them. <u>See</u> Lanier Supp. Decl. ¶ 9. Lanier maintains that Redstone DC paid him for these services, but on the occasions that he assisted Surety with its attorney network, he was not compensated. <u>Id.</u>

According to Alexis Wrenn, who identifies herself in a declaration executed on January 27, 2015 as the office manager for Surety and former office manager for Redstone DC, Surety and Redstone DC ceased taking clients for mortgage related services in June 2013, and July 2014, respectively. <u>See</u> DC Entities Prelim. Inj. Resp., Ex. 1. Pamela Thomas, whose January 27, 2015 declaration states that she is the office manager for Fortress DC, asserts that Fortress DC stopped accepting clients for mortgage related services in July 2014 as well. <u>Id.</u>, Ex. 2. In March of 2014, Rennick, Kane and Pamela

---

[22] Although Lanier states in his deposition that he fulfilled this function only until August 2013, <u>see</u> Lanier Dep. at 121-22, his timeline is contradicted by the Declaration of Neil Braslow who states that Michael Lanier responded to Braslow's resume on Craigslist in "late March 2014" to recruit him to work for Redstone Law Group. <u>See</u> FTC Motion, Ex. 400: Declaration of Neil Braslow ¶ 4. Braslow attaches to his Declaration email correspondence with Lanier about the of-counsel arrangement dated March 28, 2014. <u>Id.</u>, Ex. 400, Att. A. In addition, Andrew Taylor submits a Declaration in which he avers that Michael Lanier terminated his "of-counsel" relationship with Surety Law Group in April 2014. <u>See</u> FTC Motion, Ex. 405: Declaration of Andrew Taylor ¶ 15. Taylor's statements are supported by records wherein Lanier dismisses Taylor in an email dated April 23, 2014, copied to Alexis Wrenn at Surety Law Group, and requests that Wrenn "forward [Lanier] the resumes we collected of interested candidates for this position." <u>See</u> Menjivar Decl., Att. BB. Lanier previously conceded that he was involved in the firing of Andrew Taylor. <u>See</u> Lanier Supp. Decl. ¶ 9.

Randle formed a new partnership called Ameritrust Law Group, which also has a virtual office in D.C., with all mail forwarded to a Florida location.  See Kane Dep. at 22, 35-36.[23]

### B.  The Lawyers

Lanier Law and the DC Entities utilized a substantially similar business model. These companies operated as "law firms" in two ways: (1) they entered into agreements with attorneys throughout the United States to act as "of counsel" attorneys for the firms, see Lanier Response at 7; Lanier Decl. ¶ 5; Rennick Dep. at 128-30; FTC Motion, Exs. 400-406, and (2) each law firm was formed with one attorney as a member or partner, see Lanier Response at 7; Menjivar Decl., Atts. K, M; Robles Dep., Ex. 115.  With respect to the "of counsel" attorney network, Lanier found and hired these attorneys, both for Lanier Law and later, for Redstone DC and Surety.  See FTC Motion, Exs. 400-06; see also Supp. Lanier Decl. ¶ 9.  Some of the "of counsel" attorneys who began their relationship with Lanier Law, subsequently transitioned to working for Redstone DC, Fortress DC and/or Surety.  See FTC Motion, Exs. 401-04, 406.  The principals of Lanier Law and the DC Entities associated "of counsel" attorneys in other states so that these businesses could expand their operations to those states.  See Rennick Dep. at 129-30 ("We absolutely knew that if we were going to have a client in another state, we needed to have an attorney. . . . We needed an attorney in that state to be able to provide foreclosure defense services.").  As such, the client agreements that Lanier Law and the DC Entities provided to consumers refer to the law firm retaining "outside counsel" or working with "counsel local to Client," to provide the consumer with legal representation.  See, e.g., FTC Motion, Ex. 321, Att. D

---

[23]     Ameritrust's D.C. office is located at 20 F Street, 7th Floor, and its registered agent is listed as Rennick with an address at 4110 Southpoint Blvd.  See FTC Motion, Ex. 30, Att. A.

(2014 Redstone Application for Foreclosure Defense Services); Ex. 323, Att. A (2013 Fortress Application); Ex. 335, Att. A (2012 Surety Application) Ex.337, Att. A (2011 Lanier Law Contract).

Regardless of which firm was involved, the "of counsel" attorneys signed substantially similar agreements setting forth the terms of their relationship with Lanier Law or a DC Entity. <u>See</u> <u>e.g.</u>, FTC Motion, Ex. 404, Atts. A-C, Ex. 405, Att. A; Ex. 406, Atts. A-C (Of Counsel Agreements).   Pursuant to the Of Counsel Agreements, the attorneys agreed that they were independent contractors, responsible for their own overhead expenses and taxes. <u>Id.</u> They were paid "a monthly non-refundable retainer," either $150 or $300 a month, which represented either 3 or 6, "pre-paid billable hours from Lawyer to Firm during the course of the month." <u>See</u> <u>e.g.</u>, FTC Motion, Ex. 400, Att. A; Ex. 403, Att. A-D.  The "of counsel" attorneys were paid these sums in recognition that "[f]rom time to time, there may be matters where the Firm will want Lawyer to assist the Firm because of Lawyer's particular background and expertise."  <u>Id.</u>  In addition, the attorneys would be compensated at a rate of $75/hour for hours worked in excess of the pre-paid amount, and would be paid separately for appearances at any hearings. <u>Id.</u>

The Of Counsel Agreements also contained confidentiality clauses requiring, <u>inter alia</u>, that "once client paper work has been transferred back to the Firm, Lawyer must shred copies of all client documents and retain nothing on file that is connected to the client. Lawyer may not contact or work with client in any way, without the express consent of the Firm." <u>Id.</u>  Some, although not all, of these agreements contained paragraphs similar to the following:

> The Firm anticipates having clients in [state where "of counsel" is located] who need foreclosure defense, debt management, or similar service.  The

Firm will receive initial communications from such clients, draft and tender appropriate documents in order to 'sign up' such clients.  That document will be from the firm and signed by [lawyer-member of firm, e.g., Kane, Lanier, Santiago] or another firm partner and co-signed by electronic signature of associated [relevant state] counsel.

The Firm will then refer the client to Lawyer for Limited Scope Representation pursuant to his own local Bar's Rules and Ethics Opinions. The Firm may, if Lawyer agrees, suggest drafts correspondence [sic] and documents on Lawyer's letterhead and for Lawyer's signature, as soon as Lawyer has reviewed, revised, and approved the final draft of such. Facsimile signatures may be used for final drafts approved by Lawyer, so that the Firm can assemble and deliver such approved final drafts to appropriate parties, including the client who may file pleadings, etc., with the court.

If and when pleadings, including, but not limited to, Petitions for Temporary Restraining Order, etc., become appropriate, such may be preliminarily drafted by the Firm, based upon the availability to the firm of the underlying documents and details.  The Firm will email, or otherwise expeditiously transfer the proposed pleading to Lawyer **in order that (s)he may exercise his/her independent judgment on the content and form** of whatever (s)he signs and files locally on the client's behalf.

**The Lawyer will always have the last word and responsibility for the ultimate form, content and disposition of the work that (s)he does on behalf of his/her and the Firm's clients**.  The Firm and all of its resources are always available to assist local Lawyer on any case that the firm may send to him/her.

See, e.g., FTC Motion, Ex. 405, Att. A; Ex. 406, Atts. B & C (with language), Att. A (without language).  However, despite these provisions, several "of counsel" attorneys aver that the work they actually performed on behalf of the law firms was very limited.

For example, from August 2012 to July 2014, Chanda Roby worked for the Law Offices of Michael Lanier, Fortress DC, and Redstone DC, and declares that:

7.     I would occasionally be sent documents to look over or be notified to access the firm's database to review documents of certain consumers.  For example, I usually would look to see that documents were properly signed and that the documents were in order.  The requests were very random.

8.      There was actually not a lot to do.  Much of what was done was performed by the firms' employees in Jacksonville, Florida.

See FTC Motion, Ex. 404: Declaration of Chanda Roby (Roby Decl.) ¶¶ 6-8, 16, Att. A.  In the nearly two years that Roby worked for these firms, she does not recall ever contacting any client or potential client, and no client or potential client ever contacted her.  Id. ¶ 10. She maintains that neither Lanier nor anyone else from the firms requested that she "call consumers after they signed up as clients and introduce [herself] as the local attorney."  Id. Nor did she ever have any contact with a bank, lender, or mortgage servicer.  Id. ¶ 11. Indeed, Roby states that she "had nothing to do with loan modifications or any attempt to obtain one."  Id.  The other six "of counsel" attorneys who submitted declarations in this matter all describe a similar experience.  See FTC Motion, Ex. 400 ¶¶ 4-8, Ex. 401 ¶¶ 6, 8-9, Ex. 402 ¶¶ 4, 7-10, Ex. 403 ¶¶ 5-9, Ex. 405 ¶¶ 4, 6-10, Ex. 406 ¶¶ 4, 7, 9-10.  Some of these attorneys assert that Lanier specifically told them that the work only involved reviewing files "to see that they were properly completed, signed and dated," with "no litigation, no court appearances, and no legal research."  See FTC Motion, Ex. 402: Declaration of Ralph Estrada (Estrada Decl.) ¶ 4; see also id., Ex. 403 ¶ 5 ("[Lanier] told me that the work consisted mainly of checking files to make sure the addresses were correct, and that if there was a lawsuit in Nevada involving one of his clients, I would help with that."); Ex. 405 ¶ 4 ("[Lanier] told me that I would mainly be checking retainer agreements to ensure that there was contact information and to be sure they were signed and dated.  At some point, Mr. Lanier told me that I would not have and did not have any fiduciary relationship to any of his or Surety's clients."); Ex. 406 ¶ 4 ("[Lanier] told me that I would . . . review agreements to see that they were properly completed, signed and dated. There would be no litigation, no court appearances, and no legal research.").  Estrada

18

maintains that "[t]here was nothing of substance that [he] did," he was given no instruction, and it "seemed to [him] that they were just paying [him] to have an of counsel designation." See Estrada Decl. ¶ 8.  Andrew Taylor, an "of counsel" attorney with Surety, states that when he "asked someone in the Surety office if contact with the client was necessary, they told [him] that no follow-up by [him] was needed."  See FTC Motion, Ex. 405: Declaration of Andrew Taylor (Taylor Decl.) ¶ 10.

Some of these attorneys do recall being asked to review pleadings that a consumer would file in court pro se.  See FTC Motion, Exs. 400, 401, 403, 405, 406.  However, the review was largely editorial, correcting typographical errors, grammar, syntax and formatting.  See Taylor Decl. ¶ 8; FTC Motion, Ex. 401: Declaration of Carolyn Dale (Dale Decl.) ¶ 6.  Dale states that she "did not warrant that the pleadings would work, and [she does] not know how any case was resolved."  See Dale Decl. ¶ 6.  Notably, at least two of the "of-counsel" attorneys refused to review pro se filings because they felt uncomfortable or unqualified to do so.  See FTC Motion, Ex. 400 ¶ 7, Ex. 403 ¶ 8.  In addition, Taylor asserts that a consumer did contact him on one occasion and "wanted an attorney to accompany him to a court hearing in a foreclosure proceeding, which turned out to be a very short one—about five minutes."  See Taylor Decl. ¶ 9.  Nonetheless, Taylor maintains that he "did not have an attorney-client relationship with any of Lanier's or Surety's clients," and specifically refrained from contacting clients because he "did not want to do anything that implied that [he] was the consumer's attorney."  Id. ¶¶ 9-10.

In addition, Deron Tucker, who contracted with Lanier Law, as well as all of the DC Entities, states that he was contacted by consumers who "were under the impression that [Tucker] represented them in their quest for loan modifications."  See FTC Motion, Ex. 406:

Declaration of Deron Tucker (Tucker Decl.) ¶ 7.  However, Tucker "assured them that [he] did not represent them," and was particularly concerned by the fact that, in some cases, the calls were from consumers whose files he had not even reviewed.  Id.  Troublingly, Taylor and Dale recount that their names and signatures were used on documents without their authorization. [24]  See Taylor Decl. ¶ 14 ("A few months before I was terminated, I complained that Lanier and Surety had used my name on a document that I had not reviewed."); Dale Decl. ¶ 10 ("Although my signature appears on certain correspondence, I never physically signed or authorized that my signature be placed on any such correspondence."); see also FTC Motion, Ex. 300: Second Supplemental Declaration of Michael S. Liggins (2nd Supp. Liggins Decl.), Att. PP.[25]

Each "law firm" entity also had a licensed attorney as a member or partner. Specifically, Lanier "was at all times a sole practitioner" with respect to Lanier Law and Liberty & Trust, see Lanier Response at 7, Tina Greene, an attorney licensed in the D.C., was the attorney member of Fortress DC, Surety was formed in partnership with Pablo Santiago, Jr., Esq., who was later replaced by John James Kane, Jr., Esq., and Redstone

---

[24]     Additionally, Neil Braslow, an "of counsel" attorney for Redstone, resigned after he heard from another attorney "that there was a paralegal with Redstone who was saying that [Braslow] had reviewed her work, but [Braslow] had no knowledge of what had been produced." See FTC Motion, Ex. 400 ¶ 11. However, the Court does not consider this evidence in determining whether summary judgment is appropriate as it appears to include inadmissible hearsay and the FTC has made no showing that it can reduce the evidence to an admissible form.

[25]     Specifically, Attachment PP is a November 11, 2013 email from Alexis Wrenn to Michael Lanier asking for advice on how to respond to an email from Andrew Taylor. See 2nd Supp. Liggins Decl. ¶ 20.n., Att. PP.  Taylor emailed Alexis Wrenn and Michael Lanier to complain about the use of his signature on a letter to a lender without his permission. Id.  Wrenn's message to Lanier appears to suggest that this was a standard practice.  Specifically, Wrenn wrote to Lanier, in pertinent part: "I'm at a loss for a response to this. . . . I've reviewed everything with him, as I have with every attorney we work with, and no one balks the way that he does.  In the Interim, his name and respective signature have been removed from our qwr's." See id. Wrenn explained in an earlier email to Taylor that a "qwr," shorthand for a "Qualified Written Request," is "a letter that is sent out to the lenders to assist in obtaining information regarding each client's particular loan to assist us when working the file." Id.

was formed with Kane as its attorney member.  <u>See</u> Menjivar Decl., Atts. K (Surety Partnership Agreement), M (Redstone DC Operating Agreement); Robles Dep., Ex. 115 (Fortress DC Partnership Agreement).  However, Kane and Greene were paid a salary and were contractually excluded from receiving any profits of the foreclosure defense or debt management aspects of the firm's business.  <u>See</u> Fortress DC Partnership Agreement ¶ 7 ("Ms. Greene will be a non-equity partner, also known as salaried and not share in the profits of any foreclosure defense, loss mitigation, loan modification, debt management or some bankruptcy cases brought in through the firm."); Redstone DC Operating Agreement ¶ 3.06(a) ("Mr. Kane will also be paid 10% of the net fees earned from any new business of the firm which in any month are in excess over his salary of $4,000, but not including, and all exclusive of, debt management services and foreclosure defense matters."); Menjivar Decl., Att. K (amendment to the Surety Partnership Agreement replacing Santiago with Kane and providing that "Kane will have no initial salary, and will participate financially in the fees generated in areas other than, and to the exclusion of, foreclosure defense, loss mitigation, and debt management, to the extent of 10% of the net fees generated therein").  Moreover, Kane and Greene both maintain that they had no involvement in the debt mitigation or foreclosure defense aspects of the business.  <u>See</u> Kane Dep. at 31-32, 49, 81, 106; Greene Dep. at 37, 43, 53-54, 81.

Although Greene did provide legal services to clients that were referred to her from Fortress, those services pertained to "bankruptcies or issue[s] with probate or issue[s] with taxes or something like that . . . ."  <u>See</u> Greene Dep. at 53.  While Greene's relationship with the client "typically started off" with the client trying to save their home from foreclosure, the legal services Greene provided were always something other than foreclosure defense.

Id. at 39-40, 53-54.  Greene states that she "never worked in foreclosure defense." Id. at 54.  According to Greene, "[i]f they wanted to go through bankruptcy then I would help with their bankruptcy.  If they had some other issue that was ancillary to their foreclosure, I would handle that."  Id.  Indeed, Greene does not view foreclosure defense and loan modifications as "legal work," and testifies that: "I didn't handle loan modifications or foreclosure defense.  I just handle legal work.  When I say legal work, I'm saying things where you would need a JD and a license in that jurisdiction in order to perform." Id. at 81. Aside from those consumers to whom Greene provided bankruptcy counsel, she kept no records on Fortress DC clients.  Id. at 59-61, 67-68, 83-85.  She handled none of the client funds for Fortress DC, and she neither trained nor supervised the Jacksonville employees of Fortress DC.  See Greene Dep. at 42, 44, 58, 67-68.  Greene does recall talking to Pam Thomas and Robles periodically when a legal question would arise regarding one of the Fortress DC clients, such as a bankruptcy question or an insurance dispute.  Id. at 15-17. Greene also states that she frequently talked to attorneys, independently retained by a Fortress client, concerning that client's situation or his or her bankruptcy options.  See id. at 14-15, 23, 26, 37-38.  Notably, Greene maintains that if she spoke to a client who needed legal assistance in a state where Greene herself was not licensed, Greene would advise that client to secure an attorney and Greene would communicate with that outside attorney. Id. at 15, 23-26, 47.  Although Greene was aware that Fortress DC had an "of counsel" attorney network, she did not understand that Fortress DC had agreements with those attorneys, and "would have been against it given the fact that [she] wanted each and every client to be able to secure their own attorneys." Id. at 28-29, 46. Indeed, Greene expressed to Robles her opposition to any scenario where Fortress DC obtained attorneys on behalf

of clients.  Id. at 26.  Greene maintains that she was adamant that clients must secure their own attorneys.  Id.

According to Kane, his only role in the foreclosure defense practice was to set-up and maintain the attorney network.  See Kane Dep. at 16-17, 23-24, 30.  He did not have any part in the drafting of the consumer representation contracts, he did not prepare any pleadings or filings for any consumer to file in their loan modification, foreclosure defense, or loss mitigation case, and he did not talk to any consumer about those matters.  Id. at 80-81, 106, 115.  Kane further maintains that he did not supervise the performance of such work, nor did he have discussions with, or conduct training of, any personnel in Jacksonville regarding this work.  Id. at 37-38, 115.  Notably, during his deposition, Kane testifies that a signature purporting to be that of John James Kane, Jr., attached to several documents, is not his actual signature and those documents were not reviewed or signed by him.  See id. at 65-68, 79, 81-82, 103-04, 114, 126-28, 132-33, 142-43.

### C.  The Sales Pitch

Both Lanier Law and the DC Entities used separate companies, such as DOLMF, Pinnacle, and FURF (the "staffing" agencies), to solicit consumers, answer calls from consumers, and convince consumers to retain a law firm's services.[26]  According to Robles, these employees would answer calls and "speak to the people on the other line, see what product they were looking for," and then "do a financial statement, determine kind of where

---

[26]     Safepoint Financial Relief (Safepoint), owned by Christopher Carvajal, also referred consumers to the DC Entities.  See Rennick Dep. at 78.  According to Rennick, Redstone DC and Surety obtained a number of foreclosure defense clients on referral from Safepoint over the span of approximately a year to eighteen months.  See Rennick Dep. at 54-57.  Some employees of Safepoint were also authorized to send Redstone DC's client agreements to the consumer.  See id. at 116-19.  Safepoint was located on the second floor at 6821 Southpoint Drive North in Jacksonville, Florida.  Id. at 70.  Rennick acknowledged that Pinnacle had offices in that same building on the first floor.  Id. at 70-71.

they were at with the whole process of their debt, and at that point they would determine where that lead would go to." See Robles Dep. at 44.  Liberty & Trust operated with its own employees and did not directly make use of the third-party staffing companies, see Lanier Dep. at 164, although its employees largely came from Redstone DC or had some connection to Rennick. Id. at 141-43.  Consumers would call after receiving a letter or flyer in the mail, ostensibly from one of the "staffing" agencies, or after finding one of the Law Firms on the internet. See, e.g., FTC Motion, Ex. 13 (FURF for Surety), Ex. 19 (Surety website), Ex. 312 (DOLMF for Lanier Law); Ex. 321 (Safepoint for Redstone DC), Ex. 328 (Fortress DC website), Ex. 332 (Fortress DC).  Liberty & Trust also obtained clients through the use of solicitation letters.  See Lanier Dep. at 167-69, Ex. 152; FTC Motion, Ex. 315 ¶ 3, Ex. 325 ¶ 3.  Other consumers hired Lanier Law or the DC Entities after someone employed by a law firm or one of the "staffing" agencies contacted the consumer by telephone.  See FTC Motion, Ex. 3 ¶ 4 (Fortress DC); Ex. 14 ¶ 4 (FURF with a referral to Fortress DC); Ex. 15 ¶ 3 (Redstone DC); Ex. 21 ¶¶ 3-4 (DOLMF with a referral to Lanier as Fortress); Ex. 26 ¶ 3 (DOLMF with a referral to Lanier Law); Ex. 308 ¶ 4 (Redstone DC); Ex. 323 ¶ 6 (Fortress DC); Ex. 326 ¶ 5 (Fortress DC); Ex. 327 ¶ 6 (Redstone DC); Ex. 329 ¶¶ 6-7 (FURF with a referral to Fortress DC); Ex. 335 ¶¶ 3-4 (Surety); see also Guilty Plea (admitting that individuals working for DOLMF contacted consumers).   Four of these consumers assert that they received the calls at a telephone number registered on the National Do-Not-Call List. See FTC Motion, Ex. 21 ¶¶ 3-4 (DOLMF recommending Lanier

d/b/a Fortress), Ex. 326 ¶ 5 (Fortress DC), Ex. 329 ¶¶ 6-7 (FURF recommending Fortress

DC), Ex. 335 ¶¶ 3-4 (Surety).[27]

Several consumers contacted a Defendant after receiving the Economic Stimulus

Flyer mentioned above.  This Flyer had the appearance of an official government notice

and was titled "Economic Stimulus Mortgage Notification," and "Form 009 Payment

Reduction Notification" or "Mortgage Relief Notification."  See, e.g., FTC Motion, Ex. 311,

Att. A (2012 Flyer from DOLMF), Ex. 324, Att. A (2013 Flyer from Safepoint).  Although the

language varies slightly in different versions, the Flyer generally began:

> You are hereby notified that the property located at [specific address] has
> been pre-approved for a special program by the Government Insured
> Institutions.   In addition this property is prequalified for an Economic
> Advantage Payment or Principle Reduction Program, designed to bring
> your house payments current for less than you owe or your principal
> balance down.   There are no restrictions on equity, credit ratings, or
> mortgage delinquencies.

See e.g., id., Ex. 13, Att. A (2012 Flyer from FURF).  The Flyer urged the consumer to

contact "your Non Profit Housing Counseling Organization for your county" and listed an

800 number.  Id.  It further explained that the consumer "must contact us to complete the

registration process by reviewing your pending entitlements of savings such as: *Reduced*

---

[27]   Lanier maintains that he "never telemarketed nor did he allow anyone to do so on his behalf.  Lanier had no control over anyone outside of his own office who may have spoken to potential clients."  See Lanier Response at 21; see also id. at 9 ("Lanier Defendants never called to solicit prospective clients, nor did anyone on his behalf and so had no need to purchase do-not-call lists.").  Significantly, however, due to his use of "staffing" companies, Lanier considers himself to be the only employee of Lanier Law.  See Lanier Dep. at 164.  Thus, while the Court accepts that Lanier did not engage in telemarketing or specifically direct anyone to do so, Lanier's insistence that he did not "allow" anyone to make these calls, and did not "control" anyone outside his office reveals the limitation in his denial.  Lanier's denial does not rebut the evidence from consumers and the Florida Bar that third-party entities, typically DOLMF, engaged in telemarketing and referred consumers to Lanier Law.  See Guilty Plea; FTC Motion, Ex. 21 ¶¶ 3-4, Ex. 26 ¶ 3.  Indeed, Lanier admitted in his Guilty Plea to the Florida Bar that DOLMF solicited consumers via telephone in connection with his law practice.  Moreover, while Lanier may not have directed DOLMF or Pinnacle to engage in telemarketing, or explicitly given them his permission, he admitted in his Guilty Plea that he was responsible for their activities.  See generally Guilty Plea.

*Principal Interest Payments, Loan Payment Reduction, Debt Reduction, Budget Counseling, Delinquent Mortgage Payment Assistance and the New Home Savers Advantage Program.*"  Id.[28]  Although the third paragraph of the Flyer does inform the reader that the organization "is independent of all government agencies and departments," it also states that "[t]hese programs may require the use of Government Insured Funds." Id.

The record contains various copies of the Economic Stimulus Flyer which identify the sender as DOLMF, see FTC Motion, Exs. 311, 312, 317, FURF, id., Exs. 13, 17, Safepoint, id., Exs. 25, 324, or simply "Processing & Enrolment Center," id., Ex. 18.  The consumers who received the Flyer from DOLMF, upon calling the number listed, were referred to a Lanier Law entity.  Id., Exs. 311, 312, 317.  Consumers who called the number after receiving a Flyer from Safepoint Financial Relief either reached a Redstone DC representative or were referred to Redstone DC by someone working for Safepoint.  Id., Exs. 25, 324.  In addition, those calling in response to a FURF Flyer were referred to Surety Law Group, id., Ex. 13, or Lanier Law d/b/a as Fortress Law Group, id., Ex. 17.  As to the

---

[28]      Later versions of the Flyer omit reference to the "Non Profit Housing Counseling Organization," and urge consumers to "complete the registration process by reviewing your savings options such as . . . ."  See 2nd Supp. Liggins Decl. ¶ 19, Att. BB.  Some of the Economic Stimulus Flyers in the record also contain fine print disclaimers reading: "Information was obtained from public record sources.  Products or services has not been approved or endorsed by any government agency and this offer is not being made by any agency of the government.  This is not a notice from your Lender.  Do not delay, this situation requires swift action." See FTC Motion, Ex. 324, Att. A.  Still other versions of the Flyer included additional language in the disclaimer stating that Redstone Law Group or Surety Law Group:

> is a District of Columbia law firm, the attorney member of which is licensed to practice only in the District of Columbia.  However, Redstone [or Surety] has working arrangements with experienced and competent lawyers and law firms in many other states, so that prospective clients can be referred, at no additional cost to the client, to appropriate lawyers in the state where their claim arose.  Those lawyers in the prospective clients' states usually assume primary responsibility for each client's case, and may be assisted by Redstone [or Surety] counsel, with the client's consent, all in accordance with District of Columbia and the forum state Bars' rules.

See 2nd Supp. Liggins Decl. ¶ 19, Att. BB at 2; FTC Motion, Ex. 18, Att. A.

Economic Stimulus Flyer sent from the "Processing & Enrolment Center," the fine print of this Flyer references Surety Law Group, but when the consumer called he was told he had reached Redstone Law Group.  See id., Ex. 18.  Consumers received these Flyers from early 2012 until late 2013.  See id., Exs. 17, 25, 317, 324.  The FTC also submits copies of this same Flyer, provided in discovery or found in its search of Defendants' premises, which include references to DOLMF, FURF, Safepoint, and Redstone Law Group, and are dated from 2011 to 2014.  See 2nd Supp. Liggins Decl. ¶ 19, Att. BB.[29]  The FTC investigators also obtained a July 22, 2013 email exchange between Young and C.O. Jones of Pinnacle regarding the contents of the letter, with copies of the Economic Stimulus Flyer attached.  See id. ¶ 20, Att. CC.  Although Robles maintains that he did not draft the Economic Stimulus Flyer, he concedes that he hired and paid Avanti Media to send out "something" on behalf of DOLMF, and what they sent was the Flyer.  See Robles Dep. at 36-39, 108-09.  Lanier denies any part in "drafting, sending, approving or [using]" the Economic Stimulus Flyer.  See Lanier Response at 9.

The FTC submits declarations from over sixty consumers who largely recount similar experiences with Lanier Law, the DC Entities and Liberty & Trust (the Law Firms).[30] As previously summarized during the Preliminary Injunction Hearings, these declarations describe conversations with salespersons which were replete with misrepresentations about the Law Firms.  See Aug. 1 Tr. at 6-9, 16-17; Feb. 19 Tr. at 14-33.  Often, a consumer

---

[29]    The July 11, 2014 TRO authorized the FTC to enter and search premises connected to Defendants' businesses.  See Temporary Restraining Order at 19-22.

[30]    The Court has thoroughly reviewed the consumer declarations filed in this action and summarizes as follows the experiences shared by these consumers.  In an effort to promote clarity and conserve resources, the Court will provide examples of declarations where a consumer relates a particular interaction, but will not attempt to cite every declaration which recounts a similar experience.

would first speak to an employee of one of the "staffing" agencies, either DOLMF, FURF, or Safepoint, who would tell the consumer that one of the Law Firms would be able to help the consumer obtain a loan modification.  See, e.g., FTC Motion, Ex. 7 ¶ 3 (FURF for Fortress DC); Ex. 13 ¶ 3 (FURF for Surety); Ex. 333 ¶ 4 (Safepoint for Redstone DC); Ex. 337 ¶ 3 (DOLMF for Lanier Law).  Other consumers spoke directly to representatives of a Law Firm.  See, e.g., id., Ex. 9 ¶ 4 (paralegal at Redstone DC); Ex. 22 ¶ 4 (Lanier Law as Fortress representative); Ex. 24 ¶ 4 (Lanier Law representative); Ex. 325 ¶¶ 3-4 (Liberty & Trust representative); Ex. 335 ¶ 5 (Surety representative).   Sometimes the third-party representatives would enroll the consumers and provide them with a Law Firm's paperwork, other consumers were referred to "case managers" who would complete the enrollment process.  See, e.g., id. Ex. 4 ¶¶ 3-6 (Safepoint refers to Redstone DC case manager); Ex. 333 ¶¶ 3, 6 (Safepoint enrolls consumer for Redstone DC); Ex. 337 ¶¶ 3-4 (DOLMF enrolls consumer Lanier Law).  In these introductory conversations, either the initial contact person or the case manager, would tell the consumer that the Law Firm could obtain a loan modification for the consumer with significantly lower payments and a lower interest rate.  See, e.g., id., Ex. 7 ¶ 3 (FURF for Fortress DC); Ex. 9 ¶ 5 (Redstone DC); Ex. 13 ¶ 3 (FURF for Surety); Ex. 325 ¶ 4 (Liberty & Trust); Ex. 337 ¶¶ 3, 5 (DOLMF for Lanier Law).  Sometimes, the representative would specifically state the amount of the anticipated reduced mortgage payment, see, e.g., id., Ex. 322 ¶ 5 (Fortress DC); Ex. 329 ¶ 9 (FURF for Fortress DC); Ex. 333 ¶ 4 (Safepoint for Redstone DC), and/or that the interest rate would be lowered to 2 or 3%, id., Ex. 3 ¶ 4 (Fortress); Ex. 8 ¶ 4 (Lanier Law); Ex. 335 ¶ 6 (Surety).  Many consumers were told that the Law Firm could get the consumer a reduction in principal, removal of fees, or amounts past due wiped away.  See, e.g., id.,

Ex. 302 ¶ 7 (Fortress DC), Ex. 306 ¶ 4 (Lanier Law), Ex. 309 ¶ 8 (Redstone DC), Ex. 317 ¶ 6 (DOLMF recommending Lanier Law), Ex. 318 ¶¶ 9-10 (Redstone DC), Ex. 319 ¶ 8 (Lanier Law as Fortress); Ex. 335 ¶ 6 (Surety).   Some consumers recall that they were even "promised" or "guaranteed" a loan modification.  See, e.g., id., Ex. 309 ¶ 8 (Redstone DC representative "promised that I would be able to get a loan modification"); Ex. 311 ¶ 4 (DOLMF representative recommending Lanier Law d/b/a Fortress "sounded like the modification would be a sure thing"); Ex. 316 ¶ 6 (Lanier Law representative stated that "service was almost guaranteed to stop the foreclosure and I would be able to get a loan modification.  She also promised that Lanier Law could substantially" lower her monthly payments and interest rate); Ex. 317 ¶ 6 (representative recommending Lanier Law stated "we can almost guarantee" a loan modification); Ex. 332 ¶ 8 ("I told him that I could not afford to pay Fortress [DC] unless I was sure that I would be able to get the modification. He promised that Fortress would get me the modification and that I should not worry.").

Consumers were often reassured that the Law Firm had success rates upwards of 80 and 90%.  See id., Ex. 10 ¶ 5 (Redstone DC), Ex. 19 ¶ 4 (Surety), Ex. 22 ¶ 4 (Lanier Law as Fortress), Ex. 321 ¶ 5 (Safepoint regarding Redstone DC), Ex. 322 ¶ 5 (Fortress DC), Ex. 334 ¶ 5 (Lanier Law as Fortress).   Sometimes representatives convinced consumers that these modifications were possible by explaining that the firm would perform an "audit" or examination of their loan documents to find errors made by the lender which would increase the consumer's bargaining power or even "require" the lender to approve a modification.  See, e.g., id., Ex. 13 ¶¶ 5, 9 (Surety); Ex. 22 ¶ 6 (Lanier Law as Fortress); Ex. 25 ¶¶ 4, 8 (Redstone DC); Ex. 321 ¶ 7, Att. B (Redstone DC); Ex. 324 ¶¶ 7-8 (Redstone DC); Ex. 335 ¶ 7 (Surety).   In some cases, consumers were told that they had been

"approved" or that they "qualified" for programs designed to keep them in their homes. <u>See</u>, <u>e.g.</u>, <u>id.</u>, Ex. 7, Att. A (letter from Lanier as Fortress congratulating consumer on being approved for the "Homeowner Retention Program" and "Homeowner Bailout Program"); Ex. 17 ¶ 6, Att. C (same letter from Fortress); Ex. 21 ¶ 10, Att. B (same letter from Lanier as Fortress); Ex. 317, Att. B (substantially similar letter from Lanier Law); Ex. 25 ¶ 5, Att. B (email from Safepoint that consumer's enrollment application in Redstone DC's "Foreclosure Defense Program" was approved); Ex. 312, ¶ 5 (letter from DOLMF recommending Lanier Law and congratulating consumer on being approved for "loan modification program" by the "underwriting department"); Ex. 329, ¶ 8 (informed by FURF on behalf of Fortress DC of a "homeowner bailout program" designed for people like her); Ex. 335 ¶ 5 (Surety representative told consumer she and her husband were "qualified applicants").  Many consumers believed, and some were explicitly told, that a lawyer would work on their case, <u>see</u>, <u>e.g.</u>, <u>id.</u>, Ex. 306 ¶ 4 (Lanier Law); Ex. 324 ¶¶ 7-11 (Redstone DC); Ex. 325 ¶ 3 (Liberty & Trust), Ex. 328 ¶ 5 (Fortress DC), and some consumers were specifically told that they needed the help of a lawyer to obtain a loan modification.  <u>See</u>, <u>e.g.</u>, <u>id.</u>, Ex. 303 ¶ 6 (consumer was told that working with Fortress would make it easier to get a modification because Fortress was a law firm); Ex. 308 ¶¶ 4-5 (Redstone DC); Ex. 311, ¶ 5, Att. B (received letter from DOLMF recommending Lanier d/b/a Fortress and explaining "you are going to need legal counsel in order to have a reasonable chance to accomplish your goals").  In reliance on the foregoing or similar representations, even skeptical consumers were eventually persuaded to hire one of the Law Firms to save their

homes.  See, e.g., id., Ex. 20 ¶¶ 6-7 (FURF for Fortress DC); Ex. 327 ¶¶ 6-11 (Redstone

DC); Ex. 312 ¶ 6 (Lanier Law); Ex. 311 ¶ 4 (Lanier Law as Fortress).[31]

### D.  The Contracts & Disclaimers

In the initial stages of enrollment, consumers were assigned to a case manager who

was to provide the promised foreclosure defense services.  All consumers were told that

they must pay an advance fee before the Law Firm would perform any work.  See Feb. 19

Tr. at 18-33; see also FTC Motion, Ex. 7 ¶ 9 (stating that Pamela Thomas told him that

"Fortress could not begin working on my case . . . until all of my payments had been

made."), Ex. 16 ¶ 9 (asserting that "Pam at Fortress" stated in a message that "they were

going to stop working on the modification if no more money arrived.").  If consumers were

unable to pay the entire fee at once, they were told they could pay in several installments.

After the initial payments were completed, some consumers were told that additional work

was necessary and that to have the Law Firm continue working on their case they must

pay a monthly fee.  See, e.g., id., Ex. 307 ¶ 10 (Redstone DC); Ex. 314 ¶ 8 (Liberty &

Trust); Ex. 330 ¶ 8 (Fortress DC).  Notably, many consumers were instructed to stop

making their mortgage payments, or advised to pay the Law Firm instead of their mortgage,

including a consumer who had been making full mortgage payments up to that point.  See,

---

[31]     Lanier maintains that "[a]s an attorney, I could not, and did not, guarantee any specific outcome for any client, as reflected in the signed retainer agreements between us."  See Lanier Response at 5.  While, for purposes of resolving the FTC Motion, the Court accepts Lanier's sworn assertion that he, himself, did not make any guarantees to consumers, this does not rebut the aforementioned evidence showing that other individuals, specifically those working for the staffing or referral companies, made guarantees about Lanier's services.  Indeed, the Court notes that during the preliminary injunction stage of these proceedings Lanier submitted a declaration in a similar attempt to rebut the consumer statements describing representations made by Lanier or a representative of Lanier Law.  See generally Lanier Decl. at 13-32.  The Court discussed that evidence when it pronounced its findings at the preliminary injunction hearing on August 4, 2014, and explained that Lanier's carefully-worded denials did not actually undermine most of the statements made in the consumer declarations. See Aug. 4 Tr. at 6-9.  To the extent some consumers attribute statements to Lanier himself, which he denies, the Court has not considered those statements.  See FTC Motion, Ex. 6 ¶ 3; Lanier Decl. ¶ 61.

e.g., id., Ex. 306 ¶ 4 (Lanier Law); Ex. 327 ¶¶ 9-10 (Redstone DC)[32]; Ex. 313 ¶ 7 (Fortress DC); see also id., Ex. 332 ¶ 11 (consumer states he had made full mortgage payments until he stopped based on advice of Fortress DC representative).

The Law Firms had consumers execute several forms as part of an "Application for Foreclosure Defense Services" which included documents such as "Scope of Representation" and "Borrower's Certification" forms, a "Third Party Authorization to Release Information," a "Service/Retainer Agreement," and payment instructions.  See, e.g., id., Ex. 308 (Redstone DC Forms); Ex. 311, Atts. C, E (Lanier as Fortress Forms); Ex. 312, Att. C (Lanier Law Forms); Ex. 325, Att. A (Liberty & Trust Forms); Ex. 322, Att. A (Fortress DC Forms); Ex. 335, Att. A (Surety Forms).  Although there are slight variations, the forms for each Law Firm are noticeably consistent in content, structure, and appearance.

For example, Lanier states that the Lanier Law entities regularly utilized an agreement similar to that found at Exhibit 21, Attachment A of the FTC Motion.  See Lanier Decl. ¶ 78.  This 2012 agreement sets out a "Description of Services" which includes an "audit" review for violations of "RESPA, Truth in lending and predatory lending," as well as:

> Negotiating with loss mitigation and or bank appointed negotiator regarding client's file on one of our loss mitigation services or resolutions (I.E. loan modification offer, loan restructure, loan forbearance offer, short sale negotiation, short refinance negotiation, suspension of a foreclosure sale

---

[32]    Specifically, this consumer recalls the following exchange:
   Yvonne also told me that I should not pay my mortgage lender, and that I should instead pay Redstone $2,500 so they could help me get a loan modification.  She said that it made more sense for me to pay Redstone because Redstone was going to help me while my lender was not interested in helping me.  I told Yvonne that I was already two months behind on my mortgage payments, and I knew that the mortgage company could start foreclosure proceedings after three months.  I told her that by paying Redstone, I would be three months behind, but she assured me that this was the right thing to do.  She said that even if I was three months behind, the lender would not foreclose before Redstone could take care of the modification.  She said I would have nothing to worry about if I paid Redstone.
See FTC Motion, Ex. 327 ¶¶ 9-10.

> date, deed in lieu of foreclosure, or cash-for-keys negotiation.[)]   The modification process may vary depending on your bank, and your current mortgage situation.  The process may take a few weeks to several months to complete and receive a modification offer.  Please note that your lender may deny your loan restructure several times before we achieve a desired result.

See FTC Motion, Ex. 21 at 11.  On the sixth page of the packet of documents, the agreement states:

> **Please note**: The client acknowledges that the attorney has made no guarantees concerning the outcome of this case and that all expressions relative to the results hoped for are opinions of the attorney and are made based on the facts and law known to the attorney at the time such opinion is rendered.

> **Please note:** We never at no time recommend that homeowners miss their scheduled mortgage payments.

Id., Ex. 21 at 12.  The agreement explains that "while we can make no guarantee as to the outcome of your matter, we shall keep you generally apprised as to the status of your case." Id.  Pursuant to this agreement, the consumer agreed to pay an upfront fee of $3,900 "for negotiating your first mortgage," and further acknowledged that if the consumer canceled the "services during the negotiation process," the Law Firm had "the right to retain any amounts already paid towards services."  Id.  Although the agreement includes a payment schedule and a list of acceptable methods of payment, including cash deposits into specific bank accounts, the document makes no mention of a client trust account.  See id., Ex. 21 at 7, 14.

Fortress DC utilized a substantially similar client retainer agreement.  See id., Ex. 322, Att A.  A July 2013 version of the Fortress DC agreement includes a nearly verbatim "Scope of Representation" introduction, including a statement that Fortress DC "assures Client timely, effective, and professional legal representation."  Id.  An October 2013

version of the Fortress DC agreement modifies the "Scope of Representation" to state that Fortress DC is providing "limited scope representation" and explains that "Local counsel provides the representation, not Fortress Law Group.  Fortress Law Group provides the non-lawyer support, but does not practice law outside D.C."  See id., Ex. 323 at 6.  The Fortress DC agreements include a description of services similar to that specified in the Lanier Law agreement, including the same "audit review" and negotiation process.  Id., Ex. 322 at 7, Ex. 323 at 7.  They list similar "typical negotiation outcomes" and caution that "The process may take a few weeks to several months to complete and receive a foreclosure defense offer or until we are notified that a foreclosure defense will not be offered.  Please note that your lender may deny your loan restructure several times before we achieve a final result."  Id.  These agreements also contain the same "Please note" disclaimers as the Lanier Law contract specifying that the attorney has made no guarantees concerning the outcome, as well as a disclaimer stating: "We never at any time recommend that homeowners miss their scheduled mortgage payments."  Id.  With respect to fees, these agreements instruct the consumer that "[i]f you cancel our services at any time during the negotiating process, we will have the right to keep any fees paid to the law firm for services and time allocated to your case."  Id., Ex. 322 at 8, Ex. 323 at 7, 9.  The Fortress DC agreements go further than the Lanier Law retainer and emphasize that "The Fees noted below are intended as a pure retainer and are fully earned and non-refundable upon engagement of the firm."  Id., Ex. 322 at 8, Ex. 323 at 8.  The Fortress DC client agreements do mention the use of a trust account in a statement that: "You shall pay into trust to Fortress Law Group (the "Retainer") to be billed against for negotiating your mortgage."  Id., Ex. 322 at 8; see also id., Ex. 323 at 8 ("You shall pay into trust to Fortress

Law Group the retainer that includes your locally licensed counsel's fee to be billed against for negotiating your mortgage.").

The Redstone DC and Surety agreements are largely identical to the structure and content of the Lanier Law and Fortress DC agreements. See id., Ex. 321, Att. D, Ex. 335, Att. A.  They begin with an introductory letter titled "Application for Foreclosure Defense Services" which explains that Redstone DC, or Surety, has "successfully worked with lenders across the country in reducing interest rates, fixing adjustable rate mortgages, reallocating mortgage arrears, postponing foreclosure sale dates and other foreclosure defense services." See id., Ex. 321 at 14; Ex. 335 at 6.  The letter states that Redstone DC or Surety "makes no promises or guarantees on interest rate or loan terms, but will work diligently on your behalf to negotiate and obtain the best possible offer from your lender." Id.  Substantially similar letters accompany some copies of the Fortress DC agreements in the record.  See, e.g., id., Ex. 323 at 5.  The Redstone DC and Surety contracts also contain a "Scope of Representation" page which includes much of the same verbiage used in the Lanier Law and Fortress DC contracts, compare id., Ex. 321 at 17, Ex. 335 at 10 with Ex. 21 at 11, but utilize a disclaimer that:

> [The firm] is not associated with the government, and our service is not approved by the government or your lender.  Even if you accept this offer and use our service, your lender may not agree to change your loan.  You may stop doing business with us at any time.  You may accept or reject any offer of mortgage assistance we obtained from your lender [or servicer].  If you stop paying your mortgage, you could lose your home and damage your credit rating.

See id., Ex. 321 at 17; Ex. 335 at 10.  These contracts also modify the language in the Description of Services to refer to "foreclosure defense" rather than "loss mitigation," and caution that the lender may deny a loan restructure several times "before we achieve a

final result." Id.  The Redstone DC and Surety agreements include a disclaimer which provides: "Please note: Redstone Law Group, LLC [or Surety Law Group] does not make any promises on specific rate or terms of your loan restructure offer." Id., Ex. 321 at 17; Ex. 335 at 10.  As with the Fortress DC and Lanier Law contracts, the Surety and Redstone DC agreements state that: "If you cancel our services during the negotiation process, we have the right to retain any amounts already paid towards services." Id., Ex. 321 at 18; Ex. 335 at 11.  Notably, both the Surety and Redstone DC agreements set forth in bold that:

> This agreement does not cover any appearances in court, appearances to settlement conferences, answers of default for summons and complaint, representation in the overall foreclosure action, appeals from any judgments or orders of the court.  This agreement does not cover any litigation services, which can be provided at additional costs to our clients.

Id., Ex. 321 at 18; Ex. 335 at 11.  Similar to the Fortress DC agreement, the Surety and Redstone DC agreements explain that the consumer will "pay into trust" a retainer fee "to be billed against" for negotiating the mortgage.  See id., Ex. 321 at 18, Ex. 335 at 11.

The Liberty & Trust client agreement is built on the same structure and appearance as the Surety and Redstone DC agreements.  See id., Ex. 325, Att. A.  However, the introductory letter modifies the language slightly to read that Liberty "acts as Client's Attorney-in-Fact, to provide Limited Scope Representation and may engage third party vendors on Client's behalf . . . ." See id., Ex. 325 at 6.  The letter includes a disclaimer that "[w]e can make no promises or guarantees of your outcome, particularly on interest rate or loan terms, but will employ our best efforts and experience on your behalf to negotiate and obtain the best possible offer from your lender." Id.  On the "Scope of Representation" form, the contract includes the same disclaimer found in the Redstone DC and Surety contracts regarding the lack of affiliation with the government and the client's ability to reject

any offers obtained. Id., Ex. 325 at 9.  It also includes the same cautionary language about discontinuing mortgage payments.  Id.  The description of services omits any reference to an audit and describes the negotiation process as: "Negotiating with lender's representative regarding any potential foreclosure defense offer.  The loss mitigation application may take a few weeks to several months to complete and receive a decision.  Please note that your lender may deny your loan restructure several times before we exhaust every available avenue."  Id.  As in the Surety and Redstone DC agreements, the description of services includes the disclaimer that the law firm "does not make any promises on specific rate or terms of any loan restructure offer."  Id.  The "Service/Retainer Agreement" form references payment "into our trust account" as a monthly retainer "to be billed against for the above work," and still advises consumers that "[i]f you cancel our services during the negotiation process, we have the right to retain any amounts already earned towards services."  Id., Ex. 325 at 10.

### E.  The Results

Many of the consumers report that once they began paying a Law Firm, they stopped hearing from them, their calls were not answered or returned, they were transferred to new case managers, and it became difficult to communicate with anyone at the Firm.  See, e.g., id., Ex. 305 ¶ 8 (Lanier Law); Ex. 309 ¶ 20, 22, 27-31 (Redstone DC); Ex. 312 ¶¶ 9-10 (Lanier Law); Ex. 322 ¶ 10 (Fortress DC); Ex. 327 ¶ 16-18 (Redstone DC); Ex. 334 ¶ 10 (Lanier Law as Fortress); Ex. 335 ¶ 11 (Surety); Ex. 337 ¶¶ 8-10 (Lanier Law).  A number of consumers recall that they were asked to send the same documents and forms over and over again.  See, e.g., id., Ex. 309 ¶¶ 29-30, 32 (Redstone DC); Ex. 328 ¶ 8 (consumer states that he spent over $100 faxing paperwork to Fortress DC); Ex. 334 ¶ 8

(Lanier Law as Fortress).  Many consumers maintain that despite being led to believe that a lawyer would work on their case, they never spoke to a lawyer, were never given the name or contact information of a lawyer, or never saw anything to suggest that a lawyer had done any work for them.  See, e.g., id., Ex. 322 ¶ 7 (Fortress DC); Ex. 324 ¶ 23 (Redstone DC); Ex. 325 ¶ 3 (Liberty & Trust); Ex. 333 ¶ 7 (Lanier Law as Redstone); Ex. 335 ¶ 12 ("We even asked for the name of the attorney when things were not going well, but [Surety] would not give us the name."); Ex. 337 ¶ 10 (Lanier Law).  Some consumers contacted their lenders directly and were informed that the lender had not heard from or received the paperwork it needed from the entity the consumer believed he or she had hired.  See id., Ex. 2 ¶ 9 (Fortress DC); Ex. 5 ¶ 6 (Fortress DC); Ex. 6 ¶ 5 (Lanier Law); Ex. 7 ¶ 11 (Fortress DC); Ex. 26 ¶ 9 (Lanier Law); Ex. 301 ¶ 13 (Lanier Law as Fortress); Ex. 326 ¶ 13 (Fortress DC); Ex. 328 ¶ 10 (Fortress DC).

Most of the consumer declarants assert that Defendants were unable to obtain any modification on their behalf.  See, e.g., id., Ex. 317 ¶ 9 (Lanier Law); Ex. 321 ¶ 11 (Redstone DC); Ex. 322 ¶¶ 15-16 (Fortress DC); Ex. 325 ¶ 8, 11 (Liberty & Trust); Ex. 335 ¶ 14 (Surety).  Other consumers report that the Law Firm did obtain some modification, but not on the terms that the consumer was promised, and sometimes with a higher monthly payment than the consumer had previously been paying.  See, e.g., id., Ex. 302 ¶¶ 12-16 (Fortress DC); Ex. 318 ¶ 18 (Redstone DC); Ex. 330 ¶¶ 11-13 (Fortress DC); Ex. 336 ¶ 6 (Fortress DC).  Notably, several consumers state that although the Law Firm was unable to obtain a modification, the consumer later obtained a loan modification after working directly with the bank or with the assistance of a different company.  See id., Ex. 306 ¶ 12 (obtained loan modification through non-profit group after Lanier Law failed); Ex. 307 ¶ 15

(obtained loan modification through legal aid group after Redstone DC failed); Ex. 313 ¶ 20 (obtained loan modification with a different law group after Fortress DC failed); Ex. 318 ¶ 24 (obtained loan modification on her own after Redstone DC failed); Ex. 323 ¶ 11 (obtained loan modification with another company after Fortress DC failed).    In his Response, Lanier maintains that records, "obtained by the FTC either at the immediate access or through discovery show that thousands of modifications were obtained in the course of these law firms' defending the underlying foreclosures."  See Response at 6. However, Lanier does not specifically cite to any records supporting this contention.  Id. Moreover, his assertion that "modifications were obtained," does not indicate whether these were modifications that substantially reduced the consumer's mortgage payment and interest rate, in keeping with the representations made to consumers.  Notably, neither Lanier Law nor the DC Entities present evidence of any consumer who received a loan modification substantially reducing their monthly payment or who otherwise was satisfied with Defendants' services.[33]

---

[33]    Lanier responds to the declarations of two Liberty & Trust consumers by recounting the work Liberty & Trust performed for those consumers.  See Lanier Response at 23-26; see also FTC Motion, Exs. 315, 325.  Lanier attaches to his Response "the case notes which my office staff kept in the regular course of business, with software that I provided, at the time the described events occurred."  See id. at 23-25, Ex. 3 (Doc. 254-3).  However, the case notes do not refute that a Liberty & Trust representative made initial representations to these consumers about the firm's ability to obtain a loan modification and prevent foreclosure.  Indeed, Lanier does not deny that the statements were made, but relies on the disclaimers in the Liberty & Trust client agreement to argue that these consumers were not misled.  See Lanier Response at 22-23, 25.  Moreover, even if the case notes demonstrate that Liberty & Trust performed some work on behalf of the consumer, for the reasons discussed at the August 1, 2014 Hearing, the work performed for these consumers is irrelevant.  See Aug. 1 Tr. at 17 ("[W]hat matters is not what [Defendants] did for [the consumers], what matters is whether they violated the law in initially obtaining the representation.").  It bears noting that one of these Liberty & Trust client reports that Lanier asked her to submit a false affidavit to a bankruptcy court after that court issued an order to show cause against Lanier.  See FTC Motion, Ex. 315 ¶¶ 9-10, Att. D.  Remarkably, Lanier does not deny or otherwise respond to that portion of the consumer's declaration.

According to many of the consumers, the Law Firms never provided them with any accounting, statement or invoice detailing the services provided for the money paid. <u>See id.</u>, Ex. 306 ¶ 6 (Lanier Law); Ex. 313 ¶ 13 (Fortress DC); Ex. 314 ¶ 12 (Liberty & Trust); Ex. 326 ¶ 18 (requested but never received accounting from Fortress DC); Ex. 335 ¶ 13 (Surety). Consumers also report that they were never told where the money was going, or whether it would be placed into a trust account. <u>See</u>, <u>e.g.</u>, <u>id.</u>, Ex. 305 ¶ 7 (Lanier Law); Ex. 307 ¶ 11 (Redstone DC); Ex. 308 ¶ 8 (Redstone DC); Ex. 337 ¶ 7 (Lanier Law). Several consumers asked for refunds and were ignored, denied, or refunded only a small portion of the money they paid. <u>See</u>, <u>e.g.</u>, Ex. 305 ¶ 10 (Lanier Law refunded $900 of $3300 fee after consumer lost home in foreclosure); Ex. 306 ¶ 11 (Lanier Law told consumer that they do not give refunds); Ex. 309 ¶¶ 36-41 (Redstone DC); Ex. 313 ¶ 17 (Fortress DC); Ex. 335 ¶ 15 (Surety).

## IV. Lanier Motion

In the Lanier Motion, Lanier appears to seek partial summary judgment not as to any one claim but as to the allegations in paragraphs 19, 24, 27, and 29 of the Amended Complaint which assert that consumers were promised that an attorney would represent them in seeking a loan modification or defending against foreclosure, but consumers did not actually receive any legal representation. <u>See</u> Lanier Motion at 6. Although unclear, the Court understands Lanier's argument to be that the "of counsel" attorney in the respective state of each consumer, and not Lanier, is "solely responsible for whatever happens or fails to happen in a legal matter in his/her state." <u>See</u> <u>id.</u> at 4. According to Lanier, "the Lanier Defendants had neither right nor duty to tell local of-counsel how to represent the clients in their outlying state." <u>Id.</u> at 5. As such, Lanier moves for partial

summary judgment to the extent the FTC suggests that Lanier is responsible for the lack of adequate legal representation.  Id. at 2, 6.  However, based on the evidence set forth above, this argument is without merit.

To the extent consumers were led to believe that an attorney would assist them in obtaining a loan modification, such representations were false when made.  The Law Firms operated using a business model where "of counsel" attorneys had no substantive role in the loan modification process because the Law Firms rarely, if ever, referred clients to those attorneys to perform that function.  Indeed, the "of counsel" attorneys report that it was Lanier who described to them their limited responsibilities, and Taylor recounts that Lanier instructed him that Taylor had no fiduciary relationship to the Law Firms' clients.  See Estrada Decl. ¶¶ 4-5; Roby Decl. ¶ 5; Taylor Decl. ¶¶ 4, 10.  Lanier does not deny these statements.  While the "of counsel" attorneys may not have exercised good judgment in agreeing to Lanier's arrangement, these attorneys were unaware that consumers were being told that the "of counsel" attorneys represented them.  Rather, the "of counsel" attorneys were led to believe that their sole function was document review, and they would be contacted if additional work was necessary.  Indeed, it appears the Law Firms actually impeded contact between the "of counsel" attorneys and consumers.  See FTC Motion, Ex. 335 ¶ 12 (consumer asked for the name of their attorney but Surety refused to tell them); Ex. 405 ¶ 4 (Lanier told of-counsel attorney he had no fiduciary relationship to the clients); Ex. 405 ¶ 10 (of counsel-attorney asked and was told no contact with client was necessary); see also, e.g., id., Ex. 400, Att. A (Of Counsel Agreement with provision prohibiting contact with client without express consent of Firm).  The evidence before the Court is sufficient to establish that consumers were led to believe that they would have legal representation in

41

the loan modification process and such statements were false or misleading, not because the "of counsel" attorneys failed to fulfill their responsibilities, but because of the manner in which the Law Firms utilized their "of counsel network." Accordingly, the Lanier Motion is due to be denied.

## V. FTC Motion

### A. Common Enterprise

The FTC contends that Lanier Law, the DC Entities, and Liberty & Trust operated as a common enterprise such that the Court should treat an act by one entity as an act by each entity comprising the common enterprise. See FTC Motion at 50-51. The FTC Act disregards separate corporate forms where "the structure, organization, and pattern of a business venture reveal a 'common enterprise' or a 'maze' of integrated business entities." See F.T.C. v. Wash. Data Res., 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012). "A 'common enterprise' operates if, for example, businesses (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." See id. at 1271; see also F.T.C. v. Direct Benefits Grp., LLC, No. 6:11-cv-1186-Orl-28TBS, 2013 WL 3771322, at *18 (M.D. Fla. July 18, 2013). Courts also consider "whether business is transacted through a maze of interrelated companies," or whether there is "evidence which reveals that no real distinction existed between the [c]orporate [d]efendants." See Direct Benefits Grp., LLC, 2013 WL 3771322, at *18 (internal quotation omitted). Significantly, this analysis is distinct from the alter ego inquiry, such that "'[t]he entities formally may be separate corporations[] but operate as a common enterprise.'" Id. (quoting F.T.C. v. Grant Connect, LLC, 827 F. Supp. 2d 1199, 1218 (D. Nev. 2011) vacated in part on other grounds 763 F.3d 1094 (9th Cir. 2014)).

The FTC presents ample undisputed evidence that Lanier Law, Redstone DC, Fortress DC, Surety, Liberty & Trust, as well as several third-party entities such as DOLMF, FURF, Safepoint, and Pinnacle, operated as a common enterprise.  First, as to common control, Robles had an ownership interest in DOLMF, Pinnacle, Redstone DC, Fortress DC and Surety.  Robles also served as the Operating Manger of Lanier Law, and concedes that he was in "control" of FURF as it was staffed by DOLMF.  Rennick and Young both had ownership interests in Pinnacle, Redstone DC and Surety, and Young also owned Avanti Media which provided the Flyers used by FURF, DOLMF, Safepoint, and Surety to obtain business for both Lanier Law and the DC Entities.  Lanier owns Lanier Law as well as Liberty & Trust, and briefly shared an ownership interest in Redstone DC.  Lanier also utilized Pinnacle and DOLMF to provide staffing and enrollment services for Lanier Law, and conceded his supervisory authority over those entities to the Florida Bar.  Although Lanier did not have a contractual ownership interest in the DC Entities, he managed the of-counsel attorney network for at least Redstone DC and Surety.  In addition, emails in the record indicate that Rennick, Robles, Lanier and Young were all involved in the control and operations of the DC Entities, as well as Liberty & Trust.  See Menjivar Decl., Att. U; FTC Motion, Ex. 29: Declaration of Evan Castillo (2nd Castillo Decl.), Atts. K, L O, R; see also 2nd Supp. Liggins Decl., Att. KK (February 2014 email correspondence between Lanier and Jones regarding an issue with a Minnesota client in which Lanier mentions a meeting of the "partners," after which "we will give further direction concerning our response" and later states "for the record we have and have never had any other" Minnesota clients (emphasis added)).  For example, several emails show coordination between Robles, Lanier, Rennick, Young and Jones regarding how to respond to various

consumer complaints.  See 2nd Supp. Liggins Decl., Att. FF (January 2014 email chain involving Lanier, Robles, Jones and Alexis Wrenn of Surety regarding a consumer complaint against Lanier); Att. GG (March 2014 email chain between Jones, Lanier, Robles and Pamela Thomas regarding a New Jersey investigation into a consumer complaint about Fortress DC); Att. RR (October 2013 email chain with Young, Jones, Robles, Rennick, Lanier discussing a Connecticut investigation of a consumer complaint); Att. TT (September 2013 email chain with Young, Jones, Rennick, Robles, and Lanier regarding a subpoena from the Maryland Commissioner of Financial Regulation).

With respect to common officers and employees, because Pinnacle and DOLMF provided staffing for Lanier Law, FURF, and the DC Entities, these entities all have numerous employees in common.  In the offices of Surety, Redstone DC, and Pinnacle, FTC investigators found documents listing companies and contact information for Pinnacle, Redstone DC, Surety, and Lanier Law, as well as an "Extension List" naming Chris Carvajal (Safepoint), Marshal Wills (Liberty & Trust case analyst), Wrenn (Redstone DC & Surety office manager), Rennick, and Michael Lanier.  See Menjivar Decl. ¶ 10, Atts. E, F; Lanier Dep. at 142.  Another document found at that location lists the names and contact information for Redstone DC, Surety, Safepoint, Liberty & Trust, and Ameritrust.  See Menjivar Decl., Att. I.  Many of the "of counsel" attorneys also report that they signed agreements with several of the Law Firms, moving from Lanier Law to the DC Entities. See, e.g., Dale Decl. ¶ 5; FTC Motion, Ex. 403 ¶ 4 (asserting that she worked for Lanier Law, Fortress DC, Surety, and Redstone DC and explaining "I was told that these were all one firm, and that each one was acquiring the other or others"); see also 2nd Supp. Liggins

Decl., Att. DD (list of "Attorney Network Addresses" with of-counsel attorneys for "Lanier/Surety/Fortress/Redstone").

Pursuant to the email records, a Pinnacle employee, C.O. Jones, appears to have worked closely with Robles, Lanier, Rennick and Young on behalf of the DC Entities, as well as Liberty & Trust. The emails from Jones often refer to the DC Entities collectively, and include Robles, Rennick, Young, and Lanier in discussions about law firm business. See, e.g., Menjivar Decl., Att. U; 2nd Castillo Decl., Att. AA, Att. O[34]; 2nd Supp. Liggins Decl., Att. TT. Indeed, Jones was involved in Liberty & Trust affairs as well. See Menjivar Decl., Att. U; 2nd Supp. Liggins Decl., Att. QQ (November 5, 2013 email from Lanier to CO Jones requesting that Jones "help create a FD and LM contract for my new [F]lorida firm . . . Liberty and Trust Law Group . . . ."). This same email from Lanier forwards a flyer from Young at Avanti-Media and asks Jones to "take a look" with the statement "it's still a draft..but defensible or damn close I think.." See id., Att. QQ. When Jones responded that he was having computer problems, Lanier forwarded the email chain to Robles to inquire about resolving Jones' computer problems, adding "[w]e are wasting money on him if his equipment sucks.." Id., Att. QQ.

Evidence of record reflects that Alexis Wrenn also worked for Pinnacle, Lanier Law, Redstone DC and Surety. See Menjivar Decl. ¶ 11, Att. II; Affidavit in Opposition (Doc. 19-2) ¶ 1; Affidavit in Opposition (Doc. 19-4) ¶ 1. Lyndi Spencer, who previously worked as a case manager for Redstone DC, is the office manager of Liberty & Trust. See Lanier Dep.

---

[34] Attachment O is an April 25, 2014 email from Chantill O. Jones to Rennick, Robles, Young, Lanier and others recommending a new manner of handling client contracts in light of an issue that arose with a recent client who "called to retain one of 'our' law firms . . . ." See 2nd Castillo Decl., Att. O. The email addresses listed include domain names for Fortress, Redstone, Surety, Safepoint, and Avanti Media. Id. Lanier forwards that email to Lyndi Spencer at an email address for Liberty & Trust. Id.

at 141.  Notably, on March 3, 2014, Spencer received an email from Lanier at a Liberty & Trust address, but both before and after that time Spencer received emails from Wrenn at a Redstone email address.  See 2nd Castillo Decl., Atts. J-L.  On March 31, 2014, Spencer, at her Liberty & Trust email address, was copied on an email from a Redstone DC employee asking for assistance on a client matter, see id., Att. M, and on April 11, 2014, Spencer received an email at her Redstone address from another Redstone employee about the handling of a client letter, id., Att. N.  Lanier does not deny the overlap in employees, but maintains that these employees never worked for more than one Defendant at a time.  See Lanier Response at 13.  According to Lanier, he "never knowingly employed anyone who was simultaneously employed by another law firm."  Id.  However, in light of Lanier's reliance on staffing agencies such as Pinnacle and DOLMF, his statement that he never "employed" individuals working on behalf of another entity, does not rebut the evidence that Pinnacle and DOLMF employees worked for several different entities at a time.

These entities also shared offices and office buildings.  During the search of Defendants' premises, FTC investigators found that Surety Law Group, Redstone Law Group, and Pinnacle Legal Services were operating out of several offices located on the first floor of Southpoint I at 6821 Southpoint Drive North, Jacksonville, Florida.  See 2nd Castillo Decl. ¶ 4.  FTC investigators also found documents referencing Liberty & Trust and Lanier in the Surety, Redstone, and Pinnacle offices.  See Menjivar Decl. ¶ 10.  Within the same office complex, and next to Southpoint I, Michael Lanier had an office in Southpoint II, 4110 Southpoint Blvd., Jacksonville, Florida, which operated as the office of Liberty & Trust.  Id. ¶¶ 3, 6.  In addition, an address list found during the investigation of these

premises lists an "E&P Center" for Safepoint at the 6821 Southpoint Drive North address, and a "Processing Center" for Ameritrust at the 4110 Southpoint Blvd. address.  See 2nd Castillo Decl., Att. A.  Moreover, the records of the D.C. Department of Consumer Regulatory Affairs list the business address for both Surety and Fortress DC as 1629 K Street NW, Suite 300, Washington, DC 20006.  See Liggins Decl., Att. M, N.

The Law Offices of Michael W. Lanier operated from Jacksonville, Florida addresses at 4720 Salisbury Rd, Suite 100 and 4237 Salisbury Rd., Suite 111.  See Castillo Decl., Att. F.  Albeit under different suite numbers, FURF and the Vanguard Law Group used a 4720 Salisbury Road address, and the 4237 Salisbury Road address is connected in documents to DOLMF and Fortress DC.  See FTC Motion, Ex. 5, Att. A (FURF at 4720 Salisbury Rd. # 108), Ex. 311, Att. A (DOLMF at 4237 Salisbury Rd, Suite 103), Ex. 7 at 10 (Fortress DC Enrollment & Processing Center at 4237 Salisbury Rd, Suite 108); Menjivar Decl., Att. FF (Vanguard client agreement with 4720 Salisbury Rd address); Declaration of Edward W. Buttner IV (Doc. 26) ¶¶ 4-5 (stating that he leased a two-room second floor office at 4237 Salisbury Road to Lanier, and, at the same time, a multi-office suite on the first floor to Robles).  In addition, Lanier admitted in his Guilty Plea with the Florida Bar that DOLMF and Pinnacle shared an office with Lanier Law.  See Guilty Plea at 2 ("Records show that at one time Robles' Pinnacle Legal Services and the Department of Loss Mitigation shared an address and a phone number with [Lanier's] law office.").

The FTC also presents evidence that the entities shared advertising and commingled funds.  Most notably, as recounted above, the Economic Stimulus Flyer was sent by DOLMF, FURF, Safepoint and Surety.  Lanier Law and the DC Entities all obtained clients who were solicited through the use of this Flyer.  In addition, both Lanier Law and

Fortress DC utilized a similar "HRP/HBP Acceptance" or "HRP/HBP Approval" letter to solicit consumers to retain their services.  See FTC Motion, Ex. 7, Att. A; Ex. 17, Att. C. Lanier Law and the DC Entities also utilized virtually identical "of-counsel" agreements, and Lanier Law, the DC Entities, and Liberty & Trust used client agreements which were substantially similar in both content and appearance.   Moreover, unrebutted evidence demonstrates the transfer of funds between these entities.  For example, bank records for Lanier Law d/b/a Redstone and Lanier Law d/b/a Fortress accounts reflect deposits into these accounts for several months after Lanier supposedly stopped accepting new clients and transferred his business to the DC Entities.  See FTC Motion, Ex. 27: Declaration of Evan Castillo (Doc. 39-2; 1st Castillo Decl.) ¶¶ 4-5 (asserting that deposits for Redstone appear in a Lanier d/b/a Redstone bank account until August 8, 2013, and that deposits for Fortress appear in a Lanier d/b/a Fortress bank account until November 4, 2013); Lanier Dep. at 68-69 (stating that he transferred his practice to the D.C. law firms in October 2012); Lanier Decl. ¶¶ 11-12 (stating that Lanier d/b/a Redstone, and Lanier d/b/a Fortress stopped accepting new clients in August 2012 and October 2012 respectively).  The FTC also examined bank records belonging to Fortress DC, with Robles as the authorized signatory, which showed significant transfers to Surety as well as DOLMF.  See 1st Castillo Decl. ¶¶ 7-10.  Bank records also reveal numerous transfers of funds between Redstone DC bank accounts and Surety bank accounts, transfers between Redstone DC and Ameritrust, transfers from Pinnacle to Redstone DC, as well as transfers to Surety from Fortress DC, and from Surety to DOLMF and Pinnacle.  See Menjivar Decl., Att. PP (Redstone DC bank account statements from June 1, 2014, to June 30, 2014), Att. QQ (Surety bank account statements from June 1, 2014, to June 30, 2014).

As such, the FTC presents sufficient evidence as to each factor considered in the common enterprise analysis to establish that Lanier Law, the DC Entities, and Liberty & Trust, as well as third-parties DOLMF, FURF, Pinnacle, Safepoint, Ameritrust, Vanguard, and others, were operating as a single common enterprise controlled primarily by Rennick, Robles, Lanier and Young.  Moreover, looking at "the pattern and frame-work of the whole enterprise," see Direct Benefits Grp., LLC, 2013 WL 3771322, at *18, these entities operated together, as a maze of interrelated companies, to solicit consumers through a mail campaign (Avanti Media), answer calls and enroll consumers using similar sales tactics and client agreements (FURF, DOLMF, Safepoint), and provide consumers with some level of foreclosure defense services (Pinnacle and the Law Firms).  Likewise, Lanier Law and the DC Entities utilized the same model to structure themselves as law firms through the use of "of counsel" attorney agreements and nominal attorney members.

Lanier maintains that he had no part in any common enterprise primarily because he did not intend to form a common enterprise with the DC Entities, and because he was not a principal or authorized representative of any of the DC Entities.  See Lanier Response at 7-13.   However, even accepting Lanier's representations as true, the intent of the principals is not one of the factors courts consider in conducting a common enterprise analysis, and Lanier presents no authority for the proposition that intent is necessary.  Indeed, a common enterprise may exist even when businesses are structured as separate corporate entities.  See Direct Benefits Grp., LLC, 2013 WL 3771322, at *18.  Regardless of whether Lanier had any official relationship to the DC Entities, he concedes that he transferred Lanier Law's foreclosure defense operations to the DC Entities after the Florida Bar began its investigation, he does not dispute that he continued to manage the of-counsel

attorney network for Redstone DC and Surety, he allowed those entities, managed by his "friends," to use his merchant account portals to process consumer payments, and he continued to be actively involved in their management.  During this same time, Lanier operated Liberty & Trust with a similar business model, providing the same type of foreclosure defense services to Florida consumers, utilizing substantially similar client agreements, and involving the employees or former employees of Pinnacle and Redstone DC.  As the email records make clear, Robles, Lanier, Young and Rennick managed these entities together, with the assistance of C.O. Jones, Pamela Thomas, and Alexis Wrenn, among others, as a singular operation with multiple component parts.  While each of the businesses and individuals involved may have had separate roles to play, consumers were solicited, enrolled, and processed through one common enterprise.  Accordingly, the Court determines that Lanier Law, the DC Entities, and Liberty & Trust are responsible for the acts of each entity comprising the common enterprise, including FURF, DOLMF, Pinnacle, and Safepoint.  See Wash. Data Res., 856 F. Supp. 2d at 1272.

### B.  Counts I & II – Section 5 of the FTC Act, 15 U.S.C. § 45(a)

Section 5 of the Federal Trade Commission Act (FTCA), 15 U.S.C. § 45, prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce . . . ."  See 15 U.S.C. § 45(a)(1).  The unfair or deceptive acts forbidden under this statute include "[m]isrepresentations of material facts made for the purpose of inducing consumers to purchase services . . . ."  See F.T.C. v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988) (internal quotation omitted).  To demonstrate such a violation, "the FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably

under the circumstances, and (3) the representation was material." See F.T.C. v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003) (citing World Travel Vacation Brokers, 861 F.2d at 1029). "A representation is material if likely relied upon by a reasonable prospective purchaser." Wash. Data Res., 856 F. Supp. 2d at 1272. "An express claim used to induce the purchase of a service is presumed material." Id. at 1273. "Rather than an isolated word, phrase, or sentence, the representation's 'net impression' controls." Id. Moreover, a "tendency to deceive" is all that is required, such that proof of actual consumer deception is unnecessary. Id. Additionally, "consumer interpretation informs whether a communication was deceptive." Id.

Plainly, members of the common enterprise made numerous misrepresentations to consumers. Even setting aside those statements which a Defendant with personal knowledge specifically denied, the consumer declarations are replete with evidence of promises and guarantees regarding substantial modifications to a consumer's loan, including reductions in the payment, interest rate, and principal balance, as well as representations about the success rates of the Law Firm. Perhaps the most egregious example of deceptive conduct by Lanier Law and the DC Entities is the use of the Economic Stimulus Flyer described above. This solicitation is clearly misleading in that it is titled a "Payment Reduction" or "Mortgage Relief" Notification, references an "Economic Stimulus," and is designed to appear as an official notice from the government. The Flyer is addressed directly to the consumer, identifies his specific property, and informs the consumer that he is eligible or prequalified for "an Economic Advantage Payment or Principle Reduction Program," referencing the use of "Government Insured Funds." Although the Flyer disclaims any affiliation with the government, the consumer is left with

the impression that a non-profit organization has determined that he is eligible for government assistance with his mortgage, and the consumer need only complete a registration process to receive this assistance.  As such, everything about this Flyer is deceptive and misleading.  Members of the common enterprise also convinced consumers to use their services by telling them they had been accepted into a special "program," for example, some consumers received a letter titled "HRP/HBP Approval" which congratulated the consumer on being "approved for the Homeowner Retention Program (HRP) and the Homeowner Bailout Program (HBP) offered through Fortress Law Group." See FTC Motion, Ex. 21 at 17.  With respect to Count II, employees of the common enterprise persuaded consumers to retain the services of these Law Firms by explaining that the Firm would be able to obtain a loan modification for the consumer by auditing his or her loan documents for mistakes.  See, e.g., FTC Motion, Ex. 22 ¶ 6 ("Fortress told me that [the] bank would be required to modify the loan because they would be at fault if there were errors in the documents."), Ex. 324 ¶ 8 ("[Redstone representative] explained that Redstone would audit my loan documents for mistakes, and this would scare my mortgage company.  He said that my mortgage company would know that they had done something wrong, and I would be able to get a modification that included a reduction in the amount owed.").  Some versions of the client agreements also reference the use of these audits in the negotiation process.  However, consumers report that they never received any audit, were told the audit had revealed no errors, or that the audit had shown errors but the lender had nonetheless refused to negotiate.  See, e.g., FTC Motion, Ex. 13 ¶¶ 9-10 (consumer was told Surety found 19 violations in the audit but bank nonetheless denied modification); Ex. 25 ¶ 8 (Redstone told consumer they found no errors in the documents, and consumer

52

asked for "proof that they had done the review so that I could see that they found nothing. But they put me off and never sent me anything.").

The Court has no difficulty concluding that these promises and guarantees, used to induce consumers to retain a Law Firm's services, were material and misleading.  Indeed, although actual deception is not required, the FTC presents ample evidence that consumers were convinced that the Law Firms, through the use of audits or otherwise, would succeed in obtaining a loan modification, and that the modification would substantially reduce their payments and interest rates.  However, after paying a Law Firm thousands of dollars, often in lieu of paying their lender, consumers were denied loan modifications or were given modifications on terms far different than the ones they were promised.  In his Response, Lanier states "here under oath that, to the best of my knowledge, every one of my clients received adequate representation which met or exceeded the appropriate standard of care." <u>See</u> Lanier Response at 21.  However, even if true, this does not undermine or contradict the FTC's evidence that numerous consumers were initially induced to hire Lanier on the basis of misrepresentations.  <u>See</u> <u>F.T.C. v. IAB</u> <u>Mktg. Assocs., LP</u>, 746 F.3d 1228, 1233 (11th Cir. 2014) (rejecting argument that defendant's products offered significant value to consumers, explaining "[p]erhaps this  is so, but liability for deceptive sales practice does not require that the underlying product be worthless"); <u>see</u> <u>also</u> <u>Tashman</u>, 318 F.3d at 1277 ("[N]o one doubts the utility of phone cards or claims that the product is a scam; all that is at issue are the statements made by the defendants.").  For the same reason, Lanier's reliance on the Greer and Moran case notes and insistence that Liberty & Trust properly performed services for those consumers

is misplaced in light of the misrepresentations that were made to the consumers to induce them to hire Liberty & Trust in the first instance.

To the extent the Lanier and Fortress Defendants rely on the disclaimers contained in their client agreements to argue that consumers were not misled, this argument is unavailing. Defendants provide no authority to support the proposition that a defendant can cure an initial misrepresentation by subsequently issuing a disclaimer, and binding authority suggests to the contrary. See IAB Mktg. Assocs., LP, 746 F.3d at 1233. Regardless, even if disclaimers can be sufficient in some circumstances, no reasonable juror could conclude that the few statements here, buried in lengthy paperwork, changed the misleading net impression given to consumers through the persistent oral misrepresentations of the sales agents. See Wash. Data Res., 856 F. Supp. 2d at 1274-75. Indeed, given the numerous consumers who received and signed the contracts containing the disclaimers, but were nevertheless under the impression that the Law Firms would definitely obtain a substantial loan modification on their behalf, that an attorney would represent them in court, or that they should continue to pay the Law Firm instead of their mortgage, the Court readily concludes that the handful of written disclaimers were simply too little and too late to change the deceptive net impression. Accordingly, the Court finds that summary judgment is due to be granted in favor of the FTC and against Lanier Law, Fortress DC, and Liberty & Trust on Counts I and II of the Amended Complaint.[35]

**C. Counts III, IV, & V – Regulation O, 12 C.F.R. §§ 1015.3, 1015.4, 1015.5**

Counts III, IV and V of the Amended Complaint are premised on violations of 16 C.F.R. Part 322 (the MARS Rule), recodified at 12 C.F.R. Part 1015 (Regulation O). Failure

---

[35]   The Court will discuss the individual liability of Robles and Lanier below. See Part IV.E.

to comply with these rules and regulations constitutes an unfair or deceptive act or practice in violation of § 5(a) of the FTC Act.  <u>See</u> 12 U.S.C. § 5538(a)(1); 15 U.S.C. § 57a(d)(3). Here, the FTC asserts that Defendants violated the prohibition on advance payments set forth in 12 C.F.R. § 1015.5(a), made material misrepresentations regarding their services in violation of 12 C.F.R. § 1015.3(b)(1), and failed to make certain disclosures in their general communications, as well as in their consumer-specific communications, as required by 12 C.F.R. § 1015.4.  The Lanier and Fortress Defendants contend that the FTC is not entitled to summary judgment on these Counts because Defendants are exempt from the requirements of Regulation O pursuant to the exemption for attorneys codified at 12 C.F.R. § 1015.7.  <u>See</u> Lanier Response at 6, 14-18; Fortress Response at 1-2.  The Lanier Defendants further assert that Regulation O cannot be validly applied to licensed attorneys engaged in the practice of law, and thus, may not be enforced against the Lanier Defendants.  <u>See</u> <u>generally</u> Lanier Supplement.

Setting aside the issue of the attorney exemption, the Court observes that there is ample undisputed evidence that Defendants did not comply with the requirements of Regulation O.  Specifically, as to Count III, it is a violation of Regulation O, 12 C.F.R. § 1015.5(a), for any mortgage assistance relief service provider[36] to:

---

[36]    A mortgage assistance relief service (MARS) provider is any individual, group, or business that "provides, offers to provide, or arranges for others to provide, any mortgage assistance relief service," with the exception of the holder or servicer of the dwelling loan, or any agent or contractor thereof.  <u>See</u> 12 C.F.R. § 1015.2.  The regulation defines Mortgage Assistance Relief Service as:

> any service, plan, or program, offered or provided to the consumer in exchange for consideration, that is represented, expressly or by implication, to assist or attempt to assist the consumer with any of the following:

> (1) Stopping, preventing, or postponing any mortgage or deed of trust foreclosure sale for the consumer's dwelling, any repossession of the consumer's dwelling, or otherwise saving the consumer's dwelling from foreclosure or repossession;

(a) Request or receive payment of any fee or other consideration until the consumer has executed a written agreement between the consumer and the consumer's dwelling loan holder or servicer incorporating the offer of mortgage assistance relief the provider obtained from the consumer's dwelling loan holder or servicer.

See 12 C.F.R. § 101.5.5(a) (Advance Fee Prohibition).  Defendants squarely fall within the definition of a MARS provider as businesses offering, or arranging for others to provide, mortgage assistance relief services, such as preventing or postponing foreclosure, and negotiating or obtaining loan modifications, among other things.  The consumer declarations, as well as the client agreements, establish that Defendants demanded and received fees for their services prior to performing any work, and certainly before the consumer and his or her mortgage-holder executed any loan modification agreement. Indeed, Defendants were frequently paid for their services despite never obtaining any mortgage assistance relief on behalf of a consumer.  Defendants do not dispute their use of advance payments.

---

(2) Negotiating, obtaining, or arranging a modification of any term of a dwelling loan, including a reduction in the amount of interest, principal balance, monthly payments, or fees;
(3) Obtaining any forbearance or modification in the timing of payments from any dwelling loan holder or servicer on any dwelling loan;
(4) Negotiating, obtaining, or arranging any extension of the period of time within which the consumer may:
    (i) Cure his or her default on a dwelling loan,
    (ii) Reinstate his or her dwelling loan,
    (iii) Redeem a dwelling, or
    (iv) Exercise any right to reinstate a dwelling loan or redeem a dwelling;
(5) Obtaining any waiver of an acceleration clause or balloon payment contained in any promissory note or contract secured by any dwelling; or
(6) Negotiating, obtaining or arranging:
    (i) A short sale of a dwelling,
    (ii) A deed-in-lieu of foreclosure, or
    (iii) Any other disposition of a dwelling other than a sale to a third party who is not the dwelling loan holder.
12 C.F.R. § 1015.2.

With respect to Count IV, § 1015.3(b)(1) prohibits any MARS provider from "[m]isrepresenting, expressly or by implication, any material aspect of any mortgage assistance relief service, including but not limited to: (1) The likelihood of negotiating, obtaining, or arranging any represented service or result, such as those set forth in the definition of Mortgage Assistance Relief Service in § 1015.2."  See 12 C.F.R. § 1015.3(b)(1).  As discussed at length with respect to Count I, members of the common enterprise, including representatives of Lanier Law, Fortress DC, and Liberty & Trust, made numerous misrepresentations regarding the likelihood of obtaining a loan modification, especially with respect to reductions in monthly payments, interest rates, and principal balances.

In Count V, the FTC alleges that Defendants violated § 1015.4 by failing to make certain required disclosures, or failing to make those disclosures in a clear and prominent manner.  See Amended Complaint at 16-17.  As relevant here, "in every general commercial communication for any mortgage assistance relief service," Regulation O requires that a MARS provider include:

(1) "[Name of Company]" is not associated with the government, and our service is not approved by the government or your lender."

(2) In cases where the mortgage assistance relief service provider has represented expressly or by implication, that consumers will receive any service or result [constituting a mortgage assistance relief service], "Even if you accept this offer and use our service, your lender may not agree to change your loan."

12 C.F.R. § 1015.4(a)(1) and (a)(2).  The Regulation requires that these disclosures be made "in a clear and prominent manner," and –

(i) In textual communications the disclosures must appear together and be preceded by the heading "IMPORTANT NOTICE," which must be in bold face

font that is two point-type larger than the font size of the required disclosures; and

(ii) In communications disseminated orally or through audible means, wholly or in part, the audio component of the required disclosures must be preceded by the statement "Before using this service, consider the following information."

12 C.F.R. § 1015.4(a)(3). With respect to "all consumer-specific commercial communications," Regulation O requires, in pertinent part, the same disclosures set forth above, as well as the additional disclosures that:

(1) "You may stop doing business with us at any time. You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer]. If you reject the offer, you do not have to pay us. If you accept the offer, you will have to pay us (insert amount or method for calculating the amount) for our services." For the purposes of this paragraph (b)(1), the amount "you will have to pay" shall consist of the total amount the consumer must pay to purchase, receive, and use all of the mortgage assistance relief services that are the subject of the sales offer, including, but not limited to, all fees and charges.

12 C.F.R. § 1015.4(b)(1)-(3). These disclosures must be made in the same "clear and prominent manner" that is required for general commercial communications, with the added requirement that in telephone communications the disclosures "must be made at the beginning of the call." See 12 C.F.R. § 1015.4(b)(4). In addition, Regulation O mandates an additional disclosure, in both general and consumer-specific communications, if the MARS provider has represented that the consumer should temporarily or permanently discontinue mortgage payments. Id. § 1015.4(c). In such circumstances, the MARS provider must clearly and prominently state, in close proximity to the representation, that: "'If you stop paying your mortgage, you could lose your home and damage your credit rating.'" Id.

With respect to general communications, the FTC presents evidence regarding the content of the website for Redstone DC.  <u>See</u> Liggins Decl., Att. II (Redstone DC website). The website fails to include any disclaimer that Redstone DC "is not associated with the government, and our service is not approved by the government or your lender."  <u>See</u> <u>id.</u>; 12 C.F.R. § 1015.4(a)(1).  As to consumer-specific communications, Defendants mailed the Economic Stimulus Flyer to consumers offering mortgage assistance relief services, and this Flyer undeniably fails to comply with the requirements of Regulation O.  For example, a 2012 version of the Flyer failed to include the disclaimers listed in 12 C.F.R. § 1015.4(b)(1) or (3).  <u>See</u> FTC Motion, Ex. 17, Att. A.  Additionally, although the Flyer states that "Our organization is independent of all government agencies and departments," as well as noting in fine print that "This product or service has not been approved by any government agency and this offer is not being made by any agency of the government," <u>id.</u>, these disclaimers are not made in a "clear and prominent manner," with the requisite "IMPORTANT NOTICE" header, and do not include a statement that the service is not approved by the lender.  <u>See</u> 12 C.F.R. § 1015.4(b)(2).  Although Defendants modified the language in the Economic Stimulus Flyer over the years, even the 2014 version of the Flyer found in Defendants' offices still fails to make the disclosures mandated by the Regulation. <u>See</u> 2nd Suppl. Liggins Decl., Att. BB.

Likewise, none of the Law Firms' client agreements fully comply with the requirements of Regulation O.  For example, a Lanier Law client agreement from May of 2012 includes none of the required disclaimers.  <u>See</u> FTC Motion, Ex. 21, Att. A.  The agreement does include similar disclaimers against any guarantees and cautions against missing mortgage payments, but those disclaimers do not use the mandated language, are

not preceded by the heading "IMPORTANT NOTICE," and are not made in a "clear and prominent" manner within the meaning of the regulation.  Id., Ex. 21, Att. A; 12 C.F.R. § 1015.2 (defining "clear and prominent"), § 1015.4(b)(3)-(c).  Although Defendants modified their client agreements over time, even the most recent versions of the client agreements still fail to include all requisite disclosures, and the disclaimers that are present are not made in the required format.  See FTC Motion, Exs. 321 at 17 (2014 Redstone contract with disclaimers made in uniform font type within body of a paragraph and no statement that if consumer rejects modification offer, he does not have to pay Redstone); Ex. 325 at 9 (2014 Liberty & Trust contract with § 1015(b)(1)-(3) disclaimers made in uniform font type within body of a paragraph, § 1015(c) disclaimer bold and underlined, and no statement that if consumer rejects modification offer, he does not have to pay Liberty & Trust); Ex. 326, Att. A (2014 Fortress DC contract with none of the required disclaimers).

In light of the foregoing, the evidence establishes that the Law Firms failed to comply with the cited provisions of Regulation O.  However, the Lanier and Fortress Defendants maintain that because they offered these services in concert with a nationwide network of licensed attorneys engaged in the practice of law, they are exempt from the requirements of Regulation O.  Specifically, pursuant to § 1015.7(a):

> [a]n attorney is exempt from [Regulation O], with the exception of § 1015.5 [Advanced Fee Prohibition], if the attorney:
>
> (1) Provides mortgage assistance relief services as part of the practice of law;
>
> (2) Is licensed to practice law in the state in which the consumer for whom the attorney is providing mortgage assistance relief services resides or in which the consumer's dwelling is located; and
>
> (3) Complies with state laws and regulations that cover the same type of conduct the rule requires.

12 C.F.R. § 1015.7(a).  An attorney is also exempt from the Advance Fee Prohibition, if he or she satisfies the above requirements, and:

    (1) Deposits any funds received from the consumer prior to performing legal services in a client trust account; and

    (2) Complies with all state laws and regulations, including licensing regulations, applicable to client trust accounts.

See 12 C.F.R. § 1015.7(b).  The FTC maintains that Defendants are not exempt because the exemption applies only to individual attorneys, not to law firms, see FTC Motion at 39, and the conduct of the attorneys involved does not fall within the parameters of the exemption, id. at 40-47.  The Fortress Defendants contend that there are issues of fact regarding who is entitled to the benefit of the exemption, and whether Defendants were offering mortgage relief services as part of the "practice of law."  See Fortress Response at 2-5.  In addition, these Defendants contend that "Plaintiff has failed to provide evidence that each attorney failed to comply with state laws and regulation[s] that cover the same type of conduct the rule requires," such that "a genuine issue of material fact exists."  Id. at 5.  The Lanier Defendants argue that their services fall within the exemption due to the involvement of the "of counsel" attorneys.  See Lanier Response at 14.  Although those attorneys provided "limited scope representation," the Lanier Defendants maintain that the work they did on behalf of consumers constitutes the "practice of law."  Id. at 15-16.  According to the Lanier Defendants, any failing in the legal representation provided to a consumer is the fault of the "of-counsel" attorney because he or she "is the only firm member entitled to practice law in her state."  Id. at 16.  In the Lanier Supplement, the Lanier Defendants further maintain that to the extent the exemption is contingent on an attorney's compliance with state laws and regulations, as well as the use of a client trust

account, these provisions of the Regulation are invalid in that they exceed the rulemaking authority given to the agency under the statute.  See Lanier Supplement at 3.

To determine whether the exemption applies, the Court first considers whether the challenged portions of the Regulation are invalid.  In support of this argument, Lanier relies on the non-binding decision in Consumer Finance Protection Bureau v. Mortgage Law Group, LLP, ___ F. Supp. 3d ___, 2016 WL 183712 (W.D. Wis. Jan. 14, 2016).  In Mortgage Law Group, the court found that the Consumer Finance Protection Bureau (CFPB) "exceeded its rulemaking authority in promulgating subsections (a)(3) and (b) of § 1015.7, related to attorneys' compliance with various state laws and regulations."  See Mortg. Law Grp., 2016 WL 183712, at *10.  The court observed that when Congress passed the Dodd-Frank Wall Street Reform and Consumer Financial Protection Act of 2010, Pub. L. 111-203 § 1097, 124 Stat. 1376 (July 21, 2010) (the Consumer Protection Act), which created the CFPB, it specifically excluded the practice of law from the CFPB's supervisory or enforcement authority.  Id. at *5; see 12 U.S.C. § 5517(e)(1) ("[T]he Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law.").  However, the Consumer Protection Act included a significant "existing authority" exception to this practice of law exclusion which states that the exclusion "shall not be construed so as to limit the authority of the Bureau with respect to any attorney, to the extent that such attorney is otherwise subject to any of the enumerated laws or the authorities transferred under subtitle F or H."  See 12 U.S.C. § 5517(e)(3).  As relevant here, one of "the authorities transferred under subtitle F" was the authority of the FTC to prescribe rules under certain enumerated consumer laws, defined to include § 626

Case 3:14-cv-00786-MMH-PDB   Document 281   Filed 07/07/16   Page 63 of 78 PageID 7597

of the Omnibus Appropriations Act, 2009 (2009 Omnibus Act). <u>See</u> 12 U.S.C. §§ 5481(12)(Q), 5581 (b)(5)(A). Thus, the practice of law exclusion shall not be construed to limit the CFPB's authority to prescribe rules under § 626 of the 2009 Omnibus Act with respect to any attorney, to the extent attorneys were otherwise subject to that law. <u>Cf.</u> <u>Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Assocs., P.C.</u>, 114 F. Supp. 3d 1342, 1351 (N.D. Ga. 2015) (stating that the practice of law exclusion does not apply to FDCPA claims pursuant to the § 5517(e)(3) exception because the FDCPA is an enumerated consumer law).

Section 626 of the 2009 Omnibus Act, as amended by the Credit Card Accountability Responsibility and Disclosure Act of 2009, PL 111-24, § 511(a)(1)(B), 123 Stat. 1734, 1763-64 (May 22, 2009), directed the FTC to "initiate a rulemaking proceeding with respect to mortgage loans," and instructed that "[s]uch rulemaking shall relate to unfair or deceptive acts or practices regarding mortgage loans, which may include unfair or deceptive acts or practices involving loan modification and foreclosure rescue services." <u>See</u> 2009 Omnibus Act, PL 111-8, § 626(a)(1) as amended by Credit Card Act of 2009, PL 111-24, § 511(a)(1)(B). The law states that this grant of authority "shall not be construed to authorize the [FTC] to promulgate a rule with respect to an entity that is not subject to enforcement" of the FTC Act. <u>Id.</u> With limited exceptions, entities subject to enforcement of the FTC Act are "persons, partnerships or corporations," including companies or associations, incorporated or unincorporated. <u>See</u> 15 U.S.C. §§ 44, 45(a)(2). Although the FTC Act does include a list of entities specifically excluded from its purview, this list does not mention attorneys or otherwise refer to the practice of law. <u>See</u> 15 U.S.C. § 45(a)(2). Pursuant to that authority, the FTC promulgated the Mortgage Assistance Relief Services

63

(MARS) Rule, 16 C.F.R. part 322.  The MARS Rule contained the same attorney exemption at issue here.  <u>See</u> 16 C.F.R. § 322.7 (eff. Dec. 29, 2010).

In 2010, the Consumer Protection Act amended the language of § 626 of the 2009 Omnibus Act in pertinent part to provide as follows:

> (a)(1) The Bureau of Consumer Financial Protection shall have authority to prescribe rules with respect to mortgage loans in accordance with section 553 of title 5, United States Code. Such rulemaking shall relate to unfair or deceptive acts or practices regarding mortgage loans, which may include unfair or deceptive acts or practices involving loan modification and foreclosure rescue services. Any violation of a rule prescribed under this paragraph shall be treated as a violation of a rule prohibiting unfair, deceptive, or abusive acts or practices under the Consumer Financial Protection Act of 2010 and a violation of a rule under section 18 of the Federal Trade Commission Act (15 U.S.C. § 57a) regarding unfair or deceptive acts or practices.
>
> (2) The Bureau of Consumer Financial Protection shall enforce the rules issued under paragraph (1) in the same manner, by the same means, and with the same jurisdiction, powers, and duties, as though all applicable terms and provisions of the Consumer Financial Protection Act of 2010 were incorporated into and made part of this subsection.
>
> (3) Subject to subtitle B of the Consumer Financial Protection Act of 2010, the Federal Trade Commission shall enforce the rules issued under paragraph (1), in the same manner, by the same means, and with the same jurisdiction, as though all applicable terms and provisions of the Federal Trade Commission Act were incorporated into and made part of this section.

<u>See</u> Consumer Protection Act, PL 111-203, § 1097, 124 Stat. at 2102.  The Act explicitly provided that "[t]he [CFPB] shall have all powers and duties under the enumerated consumer laws [including § 626] to prescribe rules, issue guidelines, or to conduct studies or issue reports mandated by such laws, that were vested in the Federal Trade Commission on the day before the designated transfer date."  12 U.S.C. § 5581(b)(5)(B)(i).  Following this transfer of authority, the CFPB republished the MARS Rules as Regulation O, effective December 30, 2011, and the FTC thereafter rescinded its version of the rules.  <u>See</u> 12

C.F.R. § 1015.1; Rescission of Rules, 77 FR 22200-01, 2012 WL 1228063 (Apr. 13, 2012). Because the existing authority exception excepts § 626 of the 2009 Omnibus Act from the practice of law exclusion, the CFPB's authority to prescribe and enforce Regulation O against attorneys is not limited by that exclusion.  <u>See</u> 12 U.S.C. § 5517(e)(3).[37] Thus, just as the FTC properly exercised its authority under the 2009 Omnibus Act in promulgating the MARS Rules and attorney exemption, the CFPB had that same authority to reissue those rules as Regulation O.

Despite this grant of authority, <u>Mortgage Law Group</u> holds that the CFPB was not authorized to regulate attorneys engaged in the practice of law.  In that case, the court reasoned that "[i]nterpreting the exception in § 5517(e)(3) as granting plaintiff authority to regulate an attorney's professional conduct violates the clear mandate against regulating attorneys engaged in the practice of law."  <u>See</u> <u>Mortg. Law Grp.</u>, 2016 WL 183712 at *9. However, the "clear mandate against regulating attorneys engaged in the practice of law," is the precise "mandate" to which the existing authority exception is directed.  The court offers no other explanation for the purpose of this exception.  Notably, <u>Mortgage Law Group</u> acknowledges that the CFPB's "authority to regulate attorneys under this exception depends on the authority that the [FTC] had to regulate attorneys under the Omnibus Act," <u>see id.</u> at *6, and recognizes that the FTC Act does not exclude attorneys from the FTC's jurisdiction.  <u>Id.</u> at *8.  Nevertheless, the court determined that Congress did not intend for

---

[37]     Although this action is brought by the FTC, the statute grants the FTC the authority to enforce rules prescribed by the CFPB.  <u>See</u> 12 U.S.C. § 5581(b)(5)(C)(ii) ("Subject to Part B, the [FTC] shall have authority to enforce under the Federal Trade Commission Act a rule prescribed by the [CFPB] under this title with respect to a covered person subject to the jurisdiction of the [FTC] under that Act, and a violation of such a rule by such a person shall be treated as a violation of a rule issued under section 18 of that Act with respect to unfair or deceptive acts or practices." (internal citations omitted)).

the FTC or the CFPB "to act as a federal version of the state bar authorities." Id. at *10. However, the court cites no authority to support its apparent conclusion that the FTC was not authorized to apply the MARS Rule to attorneys engaged in the practice of law.  The practice of law exclusion in the Consumer Protection Act to which the court gives such great deference is not present in the FTC Act, nor § 626 of the 2009 Omnibus Act.  Thus, it is unclear how the existence of that exclusion affects the meaning of those laws, or the authority the FTC had to promulgate the MARS Rules from which the CFPB's authority is derived.

At its crux, the analysis in Mortgage Law Group is driven by the principle that the practice of law is traditionally regulated by the states.  See id. at *10.  For this reason, the court determined that attorneys providing mortgage assistance relief services as part of the practice of law, who are licensed in the state where the consumer resides, are exempt from Regulation O.  See Consumer Fin. Prot. Bureau v. Mortg. Law Grp., LLP, __ F. Supp. 3d ___, 2016 WL 1611385, at *5 (W.D. Wis. Apr. 21, 2016).  In finding that the CFPB cannot make this exemption contingent on an attorney's compliance with state rules and regulations, the court explains that it would "not be reasonable to assume that either [the FTC or the CFPB] could or should perform" the function of a state bar association.  See Mortg. Law. Grp., LLP, 2016 WL 183712, at *10.  However, this Court does not agree that requiring an attorney to comply with state laws and regulations, to which he is already subject, before he may claim an exemption to a Regulation designed to protect consumers from deceptive conduct constitutes "regulating the general professional conduct of attorneys." Id.  Aside from MARS-specific requirements, Regulation O does not impose new professional rules or responsibilities on attorneys, and neither the CFPB nor the FTC

seek to punish violations of the state laws or rules.[38]   Regardless, even to the extent

Regulation O does govern the practice of law, this is not inherently problematic given that

the "federal government, with the United States Supreme Court's approval, has historically

regulated some aspects of the practice of law." See Frederick J. Hanna & Assocs., 114 F.

Supp. 3d at 1358.   For example, the Supreme Court has held that "lawyers engaged in

litigation, who are also debt collectors, must still comply with terms of the Fair Debt

Collection Practices Act." Id. (collecting cases) (citing Heintz v. Jenkins, 514 U.S. 291,

295-97 (1995)).   Thus, the Court is not persuaded by the reasoning in Mortgage Law Group

that "it would not be reasonable to assume" that the FTC or CFPB could or should regulate

the practice of law.   See Mortgage Law Group, 2016 WL 183712, at *10.   Rather, pursuant

to the express terms of the statute, the Court finds that Congress provided the CFPB with

the authority to enact Regulation O, including its application to attorneys engaged in the

practice of law, and as such, § 1015.7(a)(3) and (b) of the attorney exemption were validly

issued and the FTC may enforce these provisions against Defendants here.

The Court next considers whether Defendants are entitled to protection under

Regulation O's attorney exemption.   The parties dispute whether the attorney exemption

covers only individual attorneys, or may be extended to the Law Firms.   See FTC Motion

at 38; Fortress Response at 1-2.   In addition, the parties disagree on whether the "of

counsel" attorneys were engaged in the practice of law, see FTC Motion at 46-47; Fortress

---

[38]   In finding the CFPB's interpretation of its rulemaking authority to be arbitrary and capricious, the Mortgage Law Group court explained that the CFPB has rulemaking authority "only with respect to unfair or deceptive mortgage loan practices," and "[a]n attorney's violation of a state rule of professional conduct or regarding client trust accounts does not automatically equate to an unfair or deceptive mortgage loan practice." See Mortg. Law Grp., 2016 WL 183712, at *9.   However, nothing in Regulation O suggests that the government seeks to prosecute violations of state rules of professional conduct.   Indeed, an attorney who fails to comply with his professional obligations under state law, but offers MARS within the parameters of Regulation O, will not be subject to an FTC or CFPB enforcement action.

Response at 2-3; Lanier Response at 14-16, and whether they complied with the applicable state laws and regulations.  See FTC Motion at 46-47; Fortress Response at 5; Lanier Response at 14-17.[39]  With respect to the "of counsel" attorneys, the Court is exceedingly skeptical that the superficial work given to these attorneys constitutes the "practice of law" by any definition, even under the "limited scope" model on which Lanier relies.  Moreover, if these attorneys were providing some form of legal representation to the "clients" of Lanier Law and the DC Entities, it is particularly problematic that the clients were largely unaware of even the name of their supposed attorney, much less any work that this attorney purportedly performed on their behalf.  Most consumers report never speaking to or otherwise communicating with any attorney at all, and the "of counsel" attorneys, for their part, were unaware that the Law Firms led consumers to believe that the attorney was his or her counsel.  The Court cannot conceive of any state rules of professionalism which would permit the practice of law where no communication between any attorney and the client occurs whatsoever.  While Lanier blames any "default in legal representation" on the "of counsel" attorney, see Lanier Response at 16, even if true, the failure of the "of counsel" attorney to comply with state regulations as required by the exemption prevents Lanier Law and the DC Entities from using these attorneys as the basis for claiming the attorney exemption.

---

[39]     Both Kane and Greene disavow any participation in the loan modification and foreclosure defense aspects of the business, as is also reflected in the operating agreements of the DC Entities, thus, these attorneys were plainly not "[p]roviding mortgage assistance relief services as part of the practice of law."  12 C.F.R. § 1015.7(a)(1).  Moreover, as to most of the consumers involved, Kane and Greene are not "licensed to practice law in the state in which the consumer . . . resides or in which the consumer's dwelling is located."  Id. § 1015.7(a)(2).  As such, the DC Entities cannot claim the exemption by virtue of their association with those attorneys.

Regardless of the role played by the "of counsel" attorneys, the Law Firms cannot qualify for the exemption because they failed to comply with the "state laws and regulations that cover the same type of conduct the rule requires." <u>See</u> 12 C.F.R. § 1015.7(a)(3). State professional regulations uniformly prohibit attorneys from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation. <u>See</u>, <u>e.g.</u>, Tex. St. Bar Rules, art. 10, § 9, Rule 7.02(a)(1); N.Y. Rules of Prof'l Conduct, Rule 8.4(c); Fla. St. Bar Rule 4-8.4(c); Ga. Rules of Prof'l Conduct, Rules 7.1(a)(1)-(2), 8.4(a)(4); N.J. Rules of Prof'l Conduct, Rule 8.4(c); M.D. Rules of Prof'l Conduct, Rule 7.1(a)-(b); <u>see</u> <u>also</u> ABA Ann. Mod. Rules Prof'l Conduct § 8.4(c).[40]   As discussed at length above, the undisputed evidence establishes that members of the common enterprise, for whose acts the Law Firms are responsible, engaged in conduct involving deceit and misrepresentation.   Thus, even if the attorney exemption can be applied to a law firm generally, as opposed to the acts of a specific attorney, the Law Firms here are not entitled to the exemption because they were not operating in compliance with state laws and regulations.   Because Defendants cannot satisfy the requirements of 12 C.F.R. § 1015.7(a), they are also unable to qualify for the advance payments exemption set forth in 12 C.F.R. § 1015.7(b).   <u>See</u> 12 C.F.R. § 1015.7(b) (providing that an attorney must meet the requirements of § 1015.7(a) before he can be exempt from the Advance Fee Prohibition).

---

[40]   ABA Model Rule 8.4(c) states that it "is professional misconduct for a lawyer to: . . . (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation . . . ."   A chart summarizing the states that have adopted this rule, and noting any variations, can be found on the American Bar Association website at: http://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/mrpc_8_4.authcheckdam.pdf (updated May 4, 2015).   States have almost universally adopted some version of this rule which includes a prohibition on fraudulent conduct.

### D.  Counts VI & VII – Telemarketing Sales Rule, 16 C.F.R. §§ 310.4, 310.8

In Count VI of the Amended Complaint, the FTC alleges that the Lanier Defendants violated 16 C.F.R. § 310.4(b)(1)(iii)(B) by initiating or causing others to initiate outbound telephone calls to persons whose telephone numbers are on the "do-not-call" registry.  <u>See</u> Amended Complaint at 20.[41]  In addition, the FTC asserts in Count VII that all Defendants violated 16 C.F.R. § 310.8(a) which provides:

> It is a violation of this Rule for any seller to initiate, or cause any telemarketer to initiate, an outbound telephone call to any person whose telephone number is within a given area code unless such seller, either directly or through another person, first has paid the annual fee, required by § 310.8(c), for access to telephone numbers within that area code that are including in the National Do Not Call Registry . . . .

As outlined above, the FTC presents evidence that members of the common enterprise called consumers to solicit their business on behalf of Defendants.  Moreover, the evidence establishes, and Defendants do not deny, that neither Defendants nor any other member of the common enterprise paid the annual fee required to obtain the telephone numbers, within the relevant area codes, listed on the do-not-call registry.  <u>See</u> Liggins Decl. ¶ 16, Att. O; 2nd Castillo Decl. ¶ 14.  In addition, the FTC presents unrebutted evidence that some of these consumers were contacted on telephone numbers listed on the do-not-call registry.  While Lanier maintains that neither he, nor anyone on his behalf, engaged in telephone solicitation, his conclusory general denials do not create an issue fact as to the evidence from consumers that employees of DOLMF and FURF were engaged in telephone solicitation.  Accordingly, the FTC is entitled to summary judgment on these Counts as well.

---

[41]     The FTC does not assert the claims alleged in Count VI against Robles or Fortress DC.  <u>See</u> Amended Complaint at 20.

**E.  Individual Liability**

The FTC seeks to hold Lanier and Robles individually liable for the acts of the corporate entities.  To do so, the FTC "must prove that the individual defendant[s] either participated directly or had authority to control the deceptive practice."  Wash. Data Res., 856 F. Supp. 2d at 1276.  The FTC may establish an individual's "authority to control" through evidence of his "'active involvement in business affairs and the making of corporate policy' and by evidence that 'the individual had some knowledge of the practices.'"  See IAB Mktg. Assocs., LP, 746 F.3d at 1233 (quoting F.T.C. v. Amy Travel Serv., Inc., 875 F.2d 564, 573 (7th Cir. 1989)); F.T.C. v. RCA Credit Servs., LLC, 727 F. Supp. 2d 1320, 1339 (M.D. Fla. 2010) ("Authority to control a company's practices 'may be demonstrated by active participation in the corporate affairs, including assuming duties as a corporate officer.'" (quoting F.T.C. v. World Media Brokers, 415 F.3d 758, 764 (7th Cir. 2005))).  In addition, "the FTC must establish that the individual had some knowledge of the [deceptive] practices."  IAB Mktg. Assocs., LP, 746 F.3d at 1233 (internal quotation omitted) (alteration in original); see also F.T.C. v. Gem Merch. Corp., 87 F.3d 466, 470 (11th Cir. 1996) ("Having found that [owner] had direct control over the activities of [corporation], and that he was aware of the illegal practices, the court properly held [owner] individually liable."); Wash. Data Res., 856 F. Supp. 2d at 1276 (stating that the FTC must show that "the individual defendant[s] knew or should have known of the alleged deceptive misrepresentation").  This requirement may be fulfilled by showing that an individual had "'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such representations, or an awareness of a high probability of fraud along with an

intentional avoidance of the truth.'" See Amy Travel Serv., Inc., 875 F.2d at 574 (quoting

F.T.C. v. Kitco of Nevada, Inc., 612 F. Supp. 1282, 1292 (D. Minn. 1985)).

Here, the undisputed evidence establishes that Robles and Lanier are individually

liable for the deceptive acts of the common enterprise.[42]  Robles owned or controlled

DOLMF and FURF, and had an ownership interest in Pinnacle, Fortress DC, Redstone DC

and Surety.  Robles also served as the operating manager of Lanier Law.  Robles concedes

his presence and control over the operations of DOLMF and FURF, and states that he

frequently handled consumer complaints.  Robles Dep. at 44-45, 68, 121-29.  In addition,

the email records reveal Robles' awareness of consumer complaints and investigations of

the Law Firm practices by state regulatory authorities.  See 2nd Supp. Liggins Decl., Att.

EE, FF; see also Robles Dep. at 121-22.  Robles was frequently copied on emails

discussing how to respond to these investigations and complaints.  See 2nd Supp. Liggins

Dec., Atts. FF, GG, HH.  Thus, Robles had the authority to control the activity of these

businesses, was actively involved in their affairs, and was plainly aware that consumers

were being promised or guaranteed results.  As such, the Court finds that Robles is

individually liable for the deceptive acts of the common enterprise.

Likewise, Lanier held the sole ownership interest in the Lanier Law entities as well

as Liberty & Trust.  Moreover, Lanier admitted in his Guilty Plea to the Florida Bar that he

---

[42]     Neither Robles nor Lanier qualify for the attorney exemption.  Robles is not an attorney, and Lanier engaged in a nationwide practice while operating Lanier Law and therefore, was not licensed to practice law in the states where the consumers resided.  Although Lanier has now limited his Liberty & Trust practice to Florida, the evidence indicates that representatives of Liberty & Trust also made misrepresentations to consumers regarding their services and the likelihood of success.  See FTC Motion, Ex. 315, 325.  One client reports never speaking with Lanier, see id., Ex. 325 ¶ 3, and the other states that she never heard from Lanier until a bankruptcy court issued an order to show cause against him, id., Ex. 315 ¶ 10.d.  Indeed, in response to the order to show cause, Lanier asked the client to sign an affidavit falsely describing the services he provided to the client.  See id., Ex. 315 ¶ 10.  As such, Lanier is plainly not providing mortgage assistance relief services in compliance with state laws and regulations and cannot claim the exemption.

had supervisory responsibility over DOLMF and Pinnacle during the time period that those entities worked for him.  Although Lanier did not hold an express contractual interest in the DC Entities, the email records establish that Lanier still actively participated in the conduct of those companies and exercised control over their affairs.   While Lanier states in a general legal conclusion that he had no "ownership of, authority to control, or participation in" the DC Entities, such a general denial is insufficient to create an issue of material fact in light of the FTC's specific documentary evidence to the contrary.  Moreover, the evidence amply establishes that Lanier was aware that consumers were being misled by virtue of the Florida Bar grievance proceedings, <u>see</u> Liggins Decl., Att. LL-NN, consumer complaints to the Better Business Bureau (BBB), <u>see</u> FTC Motion, Ex. 1B ¶¶ 11-15, as well as the inquiries he received from consumer protection departments in various states.  <u>See</u>, <u>e.g.</u>, 2nd Liggins Supp. Decl., Att. FF-HH; Menjivar Decl., Att. Q, DD.  Lanier admits that he was "kept up-to-date" on written and oral complaints from consumers, as well as complaints from the BBB and government agencies.  <u>See</u> Lanier Dep. at 144.  Accordingly, the Court finds ample evidence to conclude that Lanier had authority to control and actively participated in the affairs of the common enterprise, and was entirely aware of the misrepresentations made to consumers.  As such, Lanier is also individually liable for the conduct of the common enterprise.  Individual liability for corporate actions is premised on the concept that "one may not enjoy the benefits of fraudulent activity and then insulate one's self from liability by contending that one did not participate directly in the fraudulent practices."  <u>Amy Travel Serv., Inc.</u>, 875 F.2d at 574 (internal quotation omitted).  This is precisely what Lanier attempted to accomplish through the use of a web of inter-related entities, each insulating him from any direct connection to the fraudulent activity.

Nonetheless, the evidence places Lanier and Robles squarely at the center of this deceptive enterprise, and the law holds them individually responsible for its conduct.  In light of the foregoing, the Court will grant the FTC Motion as to Lanier and Robles individually as well.

### F. Remedy

As authorized by §§ 13(b) and 19 of the FTC Act, the FTC seeks both injunctive and monetary relief as a remedy for the foregoing violations.  Section 19 authorizes the Court "to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnership, and corporations resulting from the rule violation or the unfair or deceptive act or practice, as the case may be."  See 15 U.S.C. § 57b(b).  In addition, § 13(b) provides that "after proper proof, the court may issue a permanent injunction."  See 15 U.S.C. § 53(b).  The Eleventh Circuit interprets § 13(b) as "'an unqualified grant of statutory authority' to issue 'the full range of equitable remedies,' including disgorgement, which considers only the defendants' unjust gain and ignores consumer loss."  See F.T.C. v. Wash. Data Res., Inc., 704 F.3d 1323, 1326 (11th Cir. 2013) (quoting Gem Merch. Corp., 87 F.3d at 469); see also F.T.C. v. U.S. Oil & Gas Corp., 748 F.2d 1431, 1434 (11th Cir. 1984) (citing F.T.C. v. H.N. Singer, Inc., 668 F.2d 1107, 1113 (9th Cir. 1982)).  In Washington Data Resources, the Eleventh Circuit instructed that "the amount of net revenue (gross receipts minus refunds), rather than the amount of profit (net revenue minus expenses), is the correct measure of unjust gains under section 13(b)."  See Wash. Data Res., 704 F.3d at 1327.

Here, the FTC seeks an award of Defendants' net revenue.  See FTC Motion at 52-53.  Upon review, the evidence establishes that Defendants' foreclosure defense and loan

modification revenue was derived through deceptive and improper solicitations, misleading sales tactics, and impermissible advance fees.    Accordingly, the Court finds that disgorgement of those revenues is an appropriate remedy.   To calculate the size of the award, the FTC must first "'show that its calculations reasonably approximate[]' the amount of the defendant's unjust gains, after which 'the burden shifts to the defendants to show that those figures [are] inaccurate.'"  See F.T.C. v. Verity Int'l, Ltd., 443 F.3d 48, 67 (2d Cir. 2006) (quoting F.T.C. v. Febre, 128 F.3d 530, 535 (7th Cir. 1997)); see also Wash. Data Res., 856 F. Supp. 2d at 1281.   Based on the total deposits to Lanier Law and Liberty & Trust bank accounts, the financial statements from Redstone DC and Surety, as well as the answers to interrogatories from Fortress DC, the FTC calculates the amount of Defendants' total net revenues as $13,586,721.  See FTC Motion at 53; 2nd Supp. Liggins Decl. ¶¶ 8-9, 16-18, Atts. L-P, V-AA.  Defendants offer no argument or evidence to dispute the FTC's calculation.  See Fortress Response at 5-6; see generally Lanier Response.  The Court has reviewed the FTC's calculation of net revenues and the evidence in support thereof, and in the absence of any evidence or argument to the contrary finds the amount of the FTC's request to be a reasonable approximation of Defendants' net revenues.[43] Accordingly, the Court will enter a restitution award against Defendants and in favor of the FTC in the amount of $13,586,713.

The Court also determines that the FTC's request for a permanent injunction is warranted in this case.  The FTC seeks an injunction permanently enjoining the Lanier and Fortress Defendants from "operating in the loan modification/foreclosure defense area,"

---

[43]     The Court found a mathematical error in the FTC's calculation of Redstone DC's net revenue. Pursuant to the Court's calculations, Redstone DC's net revenue was $1,640,321, not $1,640,329, and the Court will adjust the total damage award accordingly.

with a "fencing-in ban as to any secured and unsecured debt relief products and services," and prohibiting these Defendants from making "misrepresentations relating to all financial products and services." See FTC Motion at 53. In "proper" cases, and after "proper" proof, the FTC Act authorizes the court to issue a permanent injunction. See 15 U.S.C. § 53(b). Permanent injunctions may be appropriate, even where a defendant's conduct has ceased, if "'the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.'" See F.T.C. v. USA Fin., LLC, 415 F. App'x 970, 975 (11th Cir. 2011) (quoting Sec. Exch. Comm'n v.Caterinicchia, 613 F.2d 102, 105 (5th Cir. 1980)). To determine the likelihood of future violations, courts consider factors such as:

> "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations . . . ."

See F.T.C. v. RCA Credit Servs., LLC, No. 8:08-CV-2062-T-27AEP, 2010 WL 2990068, at *5 (M.D. Fla. July 29, 2010) (quoting Sec. Exch. Comm'n v. CarribaAir, Inc., 681 F.2d 1318, 1322 (11th Cir. 1982)). In addition, courts may impose "fencing-in" provisions, which extend beyond the specific violations at issue, to prevent defendants from engaging in similar deceptive practices in the future, "so long as they bear a reasonable relation to the unlawful practices found to exist." See id. at *5; F.T.C. v. HES Merch. Servs. Co., Inc., No. 6:12-cv-1618-Orl-22KRS, 2015 WL 892394, at *1 (M.D. Fla. Feb. 11, 2015) ("An injunction may incorporate 'fencing-in' provisions, which 'serve to close all roads to the prohibited goal, so that (the FTC's) order may not be by-passed with impunity.'" (quoting Litton Indus., Inc. v. F.T.C., 676 F.2d 364, 370 (9th Cir. 1982))).

The FTC has presented substantial uncontroverted evidence of the Lanier and Fortress Defendants' continuous and persistent involvement in deceptive and misleading practices in connection with the sale of mortgage assistance relief services.  The myriad misrepresentations, improper solicitations, and other rule violations were egregious and recurrent over several years, despite numerous consumer complaints, as well as investigations and inquiries by state authorities.  The Lanier and Fortress Defendants have made no assurances against future violations, and indeed, they continue to deny the wrongful nature of their conduct.  These Defendants have given the Court no reason to believe that they will abstain from any further fraudulent practices in the future.  Significantly, Defendants have a history of transforming from one business to another in order to continue with their fraudulent practices, thus indicating the likelihood of future violations.  See USA Fin., LLC, 415 F. App'x at 975 (finding reasonable likelihood of future violations where record of one entity transforming into new entity).  As such, the Court finds that a permanent injunction is necessary to protect the public and prevent future violations.  Likewise, the Court determines that the "fencing-in" provision requested by the FTC is necessary and appropriate to prevent the Lanier and Fortress Defendants from engaging in similar deceptive practices.  Indeed, Defendants' attempt to superficially structure their enterprise within the attorney exemption, in order to avoid the constraints of Regulation O, demonstrates their propensity to persist in their deceptive practices if given any opening to do so.  Accordingly, the Court concludes that a permanent injunction is warranted.  To facilitate entry of an appropriate judgment awarding the requested permanent injunctive relief and monetary damages, the Court will direct the FTC to file a proposed injunction for the Court's review.  In light of the foregoing, it is

**ORDERED**:

1.  Defendant Michael W. Lanier's Motion for Partial Summary Judgment (Doc. 248) is **DENIED**.

2.  Plaintiff Federal Trade Commission's Motion and Memorandum for Summary Judgment (Doc. 246) is **GRANTED.**

3.  On or before **July 22, 2016**, the FTC shall file a proposed judgment of permanent injunction and monetary damages, and submit a copy of the proposed judgment to the undersigned's chambers email address.

4.  Thereafter, upon review of the proposed judgment, the Court will enter final judgment in favor of the FTC and against Defendants Lanier Law LLC, Fortress Law Group LLC, Liberty & Trust Law Group of Florida LLC, Fortress Law Group, PC, Michael W. Lanier and Rogelio Robles.

5.  In light of the foregoing, the Final Pretrial Conference set for July 18, 2016, is **CANCELED**, and this case is removed from the August 2016 trial term.

6.  Plaintiff's Motions in Limine (Docs. 277-279) filed on July 5, 2016, and Defendant Michael W. Lanier's Motion in Limine (Doc. 280) filed on July 6, 2016, are **DENIED, as moot**.

**DONE AND ORDERED** in Jacksonville, Florida, this 7th day of July, 2016.

*Marcia Morales Howard*

**MARCIA MORALES HOWARD**
United States District Judge

lc11
Copies to:
Counsel of Record
Pro Se Parties